**CAL-BAY CORPORATION et al. v. UNITED STATES.**

**No. 11695.**

Circuit Court of Appeals, Ninth Circuit.

June 29, 1948.

Writ of Certiorari Denied Nov. 8, 1948.

See 69 S.Ct. 134.

HEALY, Circuit Judge, dissenting.

A. J. Scampini, Walter E. Hettman and Herbert Chamberlin, all of San Francisco, Cal., for appellant.

A. DeVitt Vanech, Asst. Atty. Gen., M. Mitchell Bourquin, Sp. Asst. to the Atty. Gen., and Rogert P. Marquis and S. Billingsley Hill, Attys., Dept. of Justice, both of Washington, D. C., for appellee.

Before GARRECHT, DENMAN and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

Appellants appeal from a decree in a condemnation proceeding awarding to each damages for the taking of the lessors' and lessees' mineral rights in land under leases for oil and gas development, upon which it is claimed there had been a discovery of petroleum gas of commercial quantities. They claim, inter alia, that by the refusal of a proper instruction on the valuation of the oil and gas leases, the amount of damage awarded by the jury is grossly inadequate.

The maps in evidence, referred to in appellants' briefs, show these oil and gas leases are of land in northern Contra Costa County about 25 miles northeast of the city of Oakland and about 32 miles from the city of San Francisco. Locally, they are situated about 2½ miles southeast of Port Chicago, on Suisun Bay, a branch of the Bay of San Francisco, 5 miles southwest of the city of Pittsburg, and 3 miles northeast of the town of Concord.

The claimed discovery of natural gas in commercial quantities is thus seen to be in the second largest metropolitan area in California having a population in 1940 of 1,500,000 people—increased by at least 25% since that time. If, as appellants' testimony is, there is the likelihood that the gas bearing land also contains oil, the maps in evidence show it is within ten miles of one of the largest concentrations of oil refineries in the Pacific states, those of the Standard, Shell, Union and Associated oil companies.

We take judicial notice that this metropolitan area is a large consumer of natural gas. Since there are no sizable gas producing areas in northern California, we know it is brought through pipe lines from gas producing areas between 200 and 300 miles distant.[1]

Appellants are here concerned with the question of the value of lessors' and lessees' interests in petroleum deposits in land located within this San Francisco metropolitan area, there being evidence that a well drilled upon it disclosed gas in commercial quantities.

The leases provided for the drilling of a well for oil and gas to a depth of 5,000 feet

1 "We think the courts are entitled to take notice of the condition and development of the petroleum industry." Gilbreath v. States Oil Corp., 5 Cir., 4 F. 2d 232, 233; "Courts are entitled to take judicial notice of the condition and development of the petroleum industry." People v. Associated Oil Co., 1930, 211 Cal. 93, 105, 294 P. 717, 723.

and for the successor wells if the predecessor wells proved dry holes. The lessee, Cal-Bay Corporation, had leases on 687 acres of the land surrounding a well drilled by it, of which the government condemned 217.79 acres. The surface value of the land has been adjudicated and is not in question here.

The Corporation Commissioner of the State of California, on the surface showings of possible oil and gas, gave permission for the issuance and sale of $250,000 par value of the Cal-Bay Corporation stock upon its leasehold interest. Investors were found who bought this stock at par—that is at the rate of $366 per acre for the 687 acres in the leasehold.

A well was drilled to 5,000 feet. Its cost of over $250,000 is not recoverable as an item of damage but was admitted in evidence by the district court for its bearing upon values of the oil and gas development. Its large amount and possible successor amounts showed how the lessee regarded the value of the hazards of the venture.

Appellants to sustain their burden of proof introduced testimony that the drilling of the well was commenced in July 1943, discontinued in November 1943, and resumed in June 1944. At a depth of 3,000 feet gas showings were found. At a depth of 4,268 feet the volume of gas amounted to 100,000 cubic feet a day, and this increased to 125,000 cubic feet a day as greater depths were reached.

Location of the well was made on the recommendation of Byron Norris, a consulting geologist and petroleum engineer, and developments were supervised by him. He had been an inspector in the Division of Oil and Gas of the State of California for nine years. His qualifications as an expert are not questioned. His first inspection of the Cal-Bay properties in March 1942, was followed by careful examinations and tests. He found pronounced surface indications of oil and gas. He found pronounced favorable formations. He recommended the drilling of the well at the point where it was drilled and was of the opinion that oil or gas would there be encountered at a depth of 5,000 feet.

Drilling of the well was actively in progress when the present action was commenced on July 25, 1944, and the appellant Cal-Bay Corporation was served with notice that the appellee required immediate possession of the land subject to the action. All work was stopped. Conferences with representatives of the Navy resulted in the resumption of drilling operations in August 1944. With the approval of the district court, a stipulation was entered into on September 28, 1944, between the appellee and Cal-Bay Corporation, whereby the latter was permitted to remain in possession of two of the parcels and prosecute its drilling and other operations thereon "until one month after service by the plaintiff on said defendant, or on its attorneys herein, of written notice of the termination of said right to possession." Such notice of termination was served upon the appellant Cal-Bay Corporation on December 5, 1944, and possession was surrendered pursuant thereto on January 15, 1945.

When drilling had been resumed in August 1944, with the consent of the Navy representatives, gas showings were encountered at 4,760 feet and steadily increased. On November 28, 1944, so great a volume of gas was encountered at a depth of 4,975 feet that it "blew out" the contents of the well and temporarily disabled the well. In the opinion of Byron Norris a "commercial discovery" of natural gas had been made, stating of that phrase, "I mean gas in sufficient quantity to be saleable at a profit." What the amount of gas and hence profit would be he states is speculative. The jury was thus entitled to infer that such a commercial discovery had been made.

Expert Norris' testimony was strongly controverted by competent experts introduced by the government. They testified that no such discovery had been made and the highest value they gave for the lessees' gas and mineral rights in the land was the nominal sum of $1,513 for the 217.90 acre total of the three parcels of land, that is less than $6.91 per acre. They gave similar testimony regarding the gas and mineral rights of the lessors who had ⅛th royalties on the production, that is but $11.09 per acre. These were the amounts of the jury's verdict.

The court instructed the jury that "The defendants in this case are not entitled to make a profit because the interests which they claim they have were taken from them by the Government. By that I mean that they may not obtain more compensation by reason of the condemnation proceeding than they would obtain as the fair market value of such interest if there had not been a condemnation proceeding. The Government's wartime necessity for the use of this property, for the particular purpose standing alone, cannot be considered in estimating the value of the property taken. Demand created by wartime necessity cannot be considered in estimating the value of the interest taken. Future income or speculative productive value contemplated is not a measure of condemnation value. Profits which might be derived* from devoting the property to a particular purpose depends so much on conditions that cannot be foreseen that they have no competency. * * *"

The statement that "Future income or speculative productive value contemplated is not a measure of condemnation value" is clearly likely to confuse the jury. An oil and gas lease with a proven discovery of gas in paying quantity but speculative as to its amount, of which there is here evidence, has its market value determined by arms length bargaining of buyers and sellers on the future income contemplated by each. This instructed sentence almost certainly would be considered by the jury as a statement that neither future income nor speculative production value, contemplated by the jury, is to be considered in their determining market value. This is so though the instruction may have been intended to convey the idea that neither future income nor speculative production value contemplated alone by either party is the same as market value.

With the likelihood of the Jury's interpretation so adverse to appellants, they were entitled to the requested and refused instruction making it clear that the jury could consider possible future income and speculative production value in their determination of market value.

The next sentence that "Profits which might be derived from devoting the property to a particular purpose depends so much on conditions that cannot be foreseen that they have no competency" is clearly erroneous. Gas and oil leases, the property here condemned, have as the "particular" and only "purpose" to which they are "devoted" the production of oil and gas. To say to the jury that evidence of the value of that purpose has no "competency" is taking sides with the government's contention that the purpose to produce oil and gas is a negligible factor in the leases' market value. Practically it is saying to the jury: "In determining the value of the leases you are concerned only with the surface value of the land."

In this situation appellants requested an instruction that, in the determination of the value of gas and oil leases, it may be based on the reasonable *possibility* of production in paying quantities, even though there were not a reasonable *probability* shown of such value.[2]

Due exception to the denial of this requested instruction was made and the prejudicial effect of this claimed error was strongly argued here. It was made a section of appellants' brief entitled "6. The

* As appearing in the record from the district court, but misprinted "deprived" in the transcript.

[2] "Defendants' Instruction No. 40.

"This action concerns the value of the gas and oil rights and the leases given for such development on the lands taken by the Government. Gas and oil leases are recognized by law as being property having a market value even if such leases are in undeveloped territory. Where gas and oil rights are concerned a reasonable probability of successful development is sufficient to make such leaseholds of great value. Where there is reasonable possibility of production in paying quantities gas and oil leases are common subject of barter and sale and, therefore, have a definite ascertainable market value.

"There is a definite market value even where the prospects of successful development are too speculative to be reasonably probable. If the uncertainties are such that the mineral interests in the condemned lands are bought and sold at arms-length transactions for valuable considerations, they have a market price translated into a fair market value for condemnation purposes."

Court erred in refusing appellants' requested instructions on market value," in which it was said of the refusal to give this requested instruction 40 and two others that "Each was designed to correctly inform the jury that market value could be based on reasonable possibilities or speculative elements. *The jury was told the contrary.* Therefore, the refusal of each of these instructions was prejudicial error." (Emphasis supplied.)

There is thus no merit to the statement that appellants "made no claim either here or below that it [the requested instruction] was negatived by any charge actually given." Nor is there merit in the novel contention that the excepted refusal to give a proper and needed instruction becomes valueless if there is no exception taken to a differing and erroneous instruction.

We think the district court erred in refusing such an instruction. We take notice that, in California, discovery in land of a reasonable probability of successful development of gas or oil gives great value to such land and that it has a market value even where the prospects of possible successful development are too speculative to be reasonably probable. The evidence, later quoted, shows there are hundreds of sales of lessor and lessee rights in lands with such speculative value.

Here the mere surface indications led to leases given to the Cal-Bay Corporation for which the State Corporation Commissioner permitted the issuance and sale of stock at par value at the valuation of the land at $366 per acre. Here the stock found investors of $250,000 at that value of the leasehold interest in the land.

That such speculative value is provable in such condemnation proceedings has been recognized by the Fifth Circuit in a case concerning such interests in lands in the southern district of the oil producing State of Texas. Eagle Lake Improvement Co. v. United States, 5 Cir., 141 F.2d 562, 564, where it is stated "* * * a mineral lease is recognized by law as being property having a market value even if it covers undeveloped territory. Where oil interests are involved, a reasonable probability of successful development is sufficient to make leasehold estates of great value; indeed, where there is a reasonable possibility of production in paying quantities, mineral rights are a common subject of barter and sale, and therefore have a definite, ascertainable market value, even where the prospects of successful development are too speculative and remote to be 'reasonably probable.' "

The question remains whether this error in refusing this instruction and the court's conduct of the case under adversary principles of law caused reversible prejudice to appellants. We think they do.

The district court limited the witnesses as to value to two on each side. Appellants offered the testimony of John H. Wents, Jr., a consulting petroleum engineer and geologist then employed by the Attorney General of the United States in appraisal of California oil properties in a suit in the Southern District of California, in which the United States is a party. He had been employed as a petroleum engineer by the Associated Oil Company, the Marlin Oil Company, the C.C.M.O. Oil Company, the McMillan Oil Company, J. Paul Geddy, who as an individual has controlling interest in the Skelly Oil Company, the Pacific Western Oil Company, the George F. Geddy Incorporated, and a considerable holding in the Tidewater Associated Oil Company, and others amounting to twenty-five operators. In the last five years he had drilled 200 wells.

Wents had also been employed in appraising properties for the Chase National Bank of New York, for the Corn Exchange Bank of New York, for the Citizens Bank of Los Angeles, for the California Bank of Los Angeles. Of these he testified

"Q. By appraisals do you mean properties involving or containing either oil or natural gas or other minerals? A. Or have no potentialities whatsoever.

"Q. Have you made any appraisals for any persons or corporations buying royalty interests in oil and gas leases? A. Yes, I made many of them.

"Q. How many would you say you have made of those in the last five or ten years?

A. In the last ten years? Perhaps a thousand."

It is thus seen that Wents' wide experience was gained in appraising comparable lands, some in the wildcat area of the metropolitan Los Angeles district (as the land here is in the San Francisco district) and in the San Joaquin Valley from which oil is piped to the bay refineries, and gas piped to the consumers in the San Francisco district. He stated that he gave no consideration to the value of the oil leases in the immediate vicinity of appellants. These were leases on land in which no such discovery had been developed and were made before the discovery of commerical gas in appellants' land, of which the appellants' witnesses Norris and Bradford testified. The considerations paid in these prior leases well could be ignored by an expert.

Basing his knowledge on sales of speculative valued lands near Los Angeles and in the San Joaquin Valley, he gave to appellants' land a value much in excess of the government's experts, who disagreed with the testimony of Norris and Bradford that gas had been found in commercial quantities. For the royalty interest of ⅛th of production of one of the appellants' lessors he gave a value of $298 per acre as against $11 per acre of the government's witnesses. In addition to his other testimony, elicited by counsel, the following testimony, strongly favorable to the appellants, was brought out under questioning from the court itself:

"Q. In other words, one who goes into the market to buy a royalty of a lessor would pay for it something that would be less than the total amount that over the years would be returned? A. He would expect interest on his money and a profit on his investment.

"Q. Exactly, so if, for instance, you were buying an oil royalty of a lessor—I think you said you worked for the Pacific Western Oil Company and Mr. Geddy? A. Yes, I have.

"Q. Would you have advised him to have paid presently, that is, at that time, $62,250 for Maria Faria's one-eighth interest in the oil and gas to be produced from this property? A. Yes, your Honor, because——

"Q. How would you possibly be able to calculate the value of the lessor's oil royalty without having some production basis upon which to make that calculation? A. There are hundreds of transactions, your Honor, in oil royalty interests prior to the date when production has been established. In other words, it is a commodity which is bought and sold on the open market.

* * * * * *

"Q. I just want to get this clear in my mind, then, the figure that you have here as to what you would be willing to advise Mr. Geddy, whom I am told is a very experienced oil man, the figure of $65,250 that you would recommend to Mr. Geddy to pay for Maria Faria's one-eighth royalty interest in these 208.83 [that is $298 per acre] acres is not calculated upon any known factors that have to do with production and the like? A. It is calculated on trading factors in comparable acreage, your Honor. In other words, that is the answer, because we can't use any other method of approach, and there are hundreds of trades. There are large organizations that deal in that.

"Q. How would you know how to recommend to Mr. Geddy to pay $65,000 for this one-eighth royalty if he did not know what he could expect to get out of the production of gas and oil? A. Your Honor, I am a geologist, too, I could point out to Mr. Geddy the possibility for production on that property and other perperties. I could also point out to Mr. Geddy that the price he would be paying for this royalty on the basis of my calculations would not exceed $25 per acre per cent, some of it much lower, and I could point out to him that the going price for comparable royalties was higher than that figure.

* * * * * *

"Q. Perhaps I am getting a little too technical. There are ways, before production actually starts, of determining within reasonable limits from the depths and character of an oil or gas sand actually encountered and drilled through the reasonable probabilities of production from it? A. Yes, there is.

"Q. That is not the case here, of course? A. Yes, it was the case here. The reasonable possibilities for production were known, in my estimation.

"Q. The well had not been drilled to a point where you were able to say that the well had penetrated seventy, eighty, ninety, one hundred or one hundred and twenty-five feet of designated sand? A. In my opinion your Honor——

"Q. But the well had not been drilled to that point? A. Your Honor, may I explain something in that connection?

"Q. Just answer my question first. A. The well had not been drilled to that point at that time. However, your Honor, the well had been drilled to a depth to give us the marker points whereby the geologists could estimate the depth at which things could be encountered with a very fine degree of error.

"Q. It is on that speculative basis that you have stated that you based your valuation of this oil royalty? A. Yes, it is, your Honor."

This testimony of value, coupled with Norris' testimony of the discovery of gas in commercial quantities, was made worthless to appellants by the excepted refusal to give the requested instruction regarding the right of the jury to consider such speculative value and the giving of the instruction from which the jury well could infer that they could not consider it.

The form of the refusal was heightened by the further statement of the court to the jury that "The reason why the court has expressed the opinion [that the testimony of the appellants' experts is 'incredible'] is that it appears to the court that there is no factual basis presented in the testimony of the expert witnesses for the defense upon which the opinion of value given by them can be said to rest."

The latter statement was objected to on the ground that it sided unfairly with the contention of the government, which was that there was no discovery of commercial gas in the well. Since there was evidence from which the jury could have inferred such discovery, we agree that the court's statement was prejudicial. The value given by the apellants' experienced witnesses cannot be said to be incredible under the doctrine of res ipsa loquitur.

The statement of the court is not an analysis of the evidence. It is stating that no evidence exists of the fact of a gas production giving a saleable value to the leasehold, when the record is replete with such evidence. As was stated in Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321, "This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it."

What is there said applies as well where the judge states facts are not in evidence when they are, as when he adds to the evidence.

It is apparent that the only ground upon which Wents' valuation, based on "comparable" actual transactions, is incredible is that it included speculations as to production, which the court erroneously thought and instructed the jury are not factors in such valuation.

A further prejudicial effect in trying the case, with the court itself examining the witnesses under the theory of want of competency of the evidence of the special and only purposes of the oil and gas leases, namely, to produce oil and gas, and that contemplated future income or speculative production value is not a measure of condemnation value, appears from the court's conduct of the case in its examination of the witness, William G. Bradford. Bradford had thoroughly examined the well with a view to the purchase of the mineral interests in the land. His experience in determining the oil and gas value of leased land was even broader than that of Wents. It covered not only such lands tributary to gas consumers in the Los Angeles district but he had purchased leases "all over the State of California, here, wherever there has been what we would call a likely place, or a hot spot, as we know it." Like Wents,

he regarded the appellants' oil well as producing gas in commercial quantities and hence disregarded oil and gas leases of other land in the vicinity made before any such a well had been drilled.

Bradford had testified to a value of $200 an acre for the lessors' 12½% royalty in the product. This in the gas leasing parlance is $3,500 a per cent for the 208 acres involved. The court took over the cross-examination of the witness and the following unfortunate colloquy occurred:

"The Court: Where has anybody in California ever paid a $3,500 a per cent [that is $200 per acre] for a landlord's interest in a gas lease where the land was not proven? A. Your Honor, I just sold one—

"The Court: Can you answer that? A. Yes, I have bought it and sold it for that.

"The Court: Where was this? A. I sold one, a wildcat drilling, sold it to the Seaboard Oil, a matter of record here, in the last three months, $3,500 for one per cent in three and a half acres.

"The Court: Unproven land? A. It was unproven, your Honor.

"The Court: Will you tell me who made that lease, the parties to it, and when it was done? A. Yes, sir, I will. The Petroleum Corporation and the Producers Oil are owners. They are San Francisco people.

"The Court: Are you telling me that the Seaboard Oil Company pay you $3,500 a per cent for a lessor's royalty in an unproved piece of land? A. Your Honor, Mr. Scampini—

"The Court: Just answer that question. A. Yes, sir, they paid more than that.

"The Court: The Seaboard Oil Company for a lessor's interest paid $3,500 a per cent for an unproved piece of land? A. Yes, sir, they did.

"The Court: *I just can't believe you are telling the truth on that.*

"Mr. Scampini: Your Honor, I will cite your Honor to the corporation permit on the subject before the Corporation Department. I will give your Honor the number of the transaction.

"The Court: I asked a very definite question of the witness and he has answered it. We will leave it go at that." (Emphasis supplied.)

Quite likely this comment that "I just can't believe you are telling the truth" about this payment to the witness was not intended to be as harsh as it sounds. It came from an able judge, trying the case in the pressure and strain of a court where for each acting judge there are annual docketings 71% and pending cases 57% in excess of the average load of all the other federal judges. However, there could be no doubt of its likely effect on the jury.

There was nothing in the record to justify this aspersion on the veracity of this witness and nothing was later offered by the government to show that the sale testified as having been made to the San Francisco buyers had not been made. This testimony, if not so impugned, would have been of double value to appellants. It not only showed a wildcat sale for the amount inquired of by the court but also that there were buyers in the San Francisco metropolitan area of such oil and gas leases on distant lands. Moreover, it had the heightened value of being brought out by the court's own questioning.

This statement was not withdrawn and nothing done to relieve the witness of the charge of lying. Its effect was not cured by subsequently stating to the jury that all the court's comment was merely its opinion on the "weight" of the evidence. The situation is similar to that in Quercia v. United States, supra, 289 U.S. at pages 469, 471, 472, 53 S.Ct. at page 699, where, as here, the trial judge impugned the integrity of the witness, and the Supreme Court stated of the judge's privilege to comment on the evidence,

The judge's "privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be one-sided'; that 'deductions and theories not warranted by the evidence should

be studiously avoided.' * * * In the instant case, the trial judge did not analyze the evidence; he added to it, and he based his instruction upon his own addition. * * * He did not review the evidence to assist the jury in reaching the truth, but in a sweeping denunciation repudiated as a lie all that the accused had said in his own behalf which conflicted with the statements of the government's witnesses. This was error and we cannot doubt that it was highly prejudicial.

"*Nor do we think that the error was cured by the statement of the trial judge that his opinion of the evidence was not binding on the jury and that if they did not agree with it, they should find the defendant not guilty.* His definite and concrete assertion of fact, which he had made with all the persuasiveness of judicial utterance, as to the basis of his opinion, was not withdrawn. His characterization of the manner and testimony of the accused was of a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence. * * * The judgment must be reversed."[3] (Emphasis supplied.)

When the appellants offered to produce the authorization of the California Corporation Department of this particular sale in San Francisco, the court made a second unjust remark which the jury must have regarded as taking sides with the government. Concerning this second deprecatory comment on the Corporation Department, the record is

"The Court: Well, I do not know what has happened to our Corporation Department in the State of California. That is all I can say.

"Mr. Scampini: If it please the Court, the Seaboard Company—

"The Court: I am sorry to have made *this* comment. I will tell the Jury to disregard it. It is just a comment of the Court.

"Mr. Scampini: I ask now to offer evidence in support of the statement of Mr. Bradford in answer to your Honor's question, and I also protest for the purposes of record, *your Honor's comments in respect of the Corporation Department* as being prejudicial to our case before this Jury.

"The Court: I will tell the Jury to disregard the Court's statement. The comment of the Court was on the weight of the evidence and the Jury is not bound by it. * * *" (Emphasis supplied.)

This correction of this aspersion on the Corporation Department left in emphatic contrast the uncorrected aspersion on the veracity of the witness Bradford.

Here, to the excepted refusal of the court to instruct the jury that the speculative value of leases of such land could be considered by the jury, is added such contemptuous treatment of a witness of that value.

It is seen that from the testimony of Norris and Bradford the jury could infer that here was a first well close to San Francisco which produced gas in commercial quantities. There was no corresponding development near the condemned land and hence no sales of leases on nearby lands for a basis of valuation. Lease transactions prior to any nearby discovery of gas in commercial quantities properly could be ignored in determining values after such discovery.

In this situation, the government claims that persons familiar with the value of such leases of lands with wells of proven profit, speculative in amount, of which there is here evidence, in the area producing gas for Los Angeles and the San Joaquin Valley producing gas for San Francisco are not competent witnesses as to the value of such lands. This contention is tantamount to saying that if the testimony of such witnesses is not competent, no expert valuation testimony can ever be given in a field which has its first profitably producing gas well.

We do not agree. The contrary has been stated in Montana R. Co. v. Warren,

3 Holding similarly are United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381; Starr v. United States, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841; Hunter v. United States, 5 Cir., 62 F.2d 217, 220; Musick v. United States, 3 Cir., 2 F.2d 711; Hobart v. United States, 6 Cir., 299 F.2d 784, 785.

137 U.S. 348, 354, 11 S.Ct. 96, 97, 34 L.Ed. 681, "* * * The witnesses whose testimony is complained of, all testified that they knew the land and its surroundings; and many of them that they had dealt in mining claims situated in the district, and had opinions as to the value of the property. *It is true, some of them did not claim to be familiar with sales of other property in the immediate vicinity,* and the want of that means of knowledge is the specific objection made in the supreme court of the territory to the competency of those witnesses. *But the possession of that means of knowledge is not essential.* It has often been held that farmers living in the vicinity of a farm whose value is in question, may testify as to its value, although no sales have been made to their knowledge of that or similar property. Indeed, if the rule were as stringent as contended, no value could be established in a community until there had been sales of the property in question, or similar property. After a witness has testified that he knows the property and its value, he may be called upon to state such value. The means and extent of his information, and therefore the worth of his opinion, may be developed at length on cross-examination. And it is fully open to the adverse party, if not satisfied with the values thus given, to call witnesses in the extent of whose knowledge and the weight of whose opinions it has confidence."

Here in the last analysis the testimony is as to the value of leases producing gas from nearer and more distant fields to be transported to both metropolitan areas, where it is sold and consumed. Experience in the values of leases in the San Joaquin area which supplies gas to San Francisco, clearly qualifies one to testify regarding commercial gas leases, testified as proven, which are nearer San Francisco and where the gas has less distance to be transported for sale in the market of their consumption. So also a valuation expert on leases of gas supplying one of California's metropolitan areas is qualified to advise on leases supplying another California metropolitan area. Since the whole state is the market for the leases' gas and oil, the opinion of their value by persons familiar with the sales of such leases is much more than the "guess by informed persons" referred to in United States v. Miller, 317 U.S. 369, 375, 63 S.Ct. 276, 280, 87 L.Ed. 336, 147 A.L.R. 55.

Appellee cites cases stating the wide latitude of a trial court in excluding expert testimony. With these cases we agree. The trial courts should have a wide latitude in excluding evidence of remote relevance and equal freedom in commenting upon the evidence which, as here, the court admitted. However, that freedom is here exceeded in the attack upon the witnesses' integrity and the statement of the absence of evidence to support the witnesses' valuations. The refusal to give the requested instruction and the court's bald statement that there is no evidence, considered with all these other occurrences at the trial, constitute prejudicial error and appellants are entitled to a new trial.

The judgment is reversed as to all appellants.

Reversed.

HEALY, Circuit Judge (dissenting).

The majority's reversal of the judgment appears to be built around an instruction given by the court and the refusal to give appellants' requested instruction No. 40. As I read the opinion other matters are brought in as intensifying the assumed prejudicial effect of the errors first mentioned.

The instruction held to be erroneous does not, as seems to be thought, advise the jury to disregard speculative values or speculative considerations which influence market value. This particular portion of the charge is devoted to conditions or considerations peculiar to the immediate parties as distinguished from the ordinary conditions in light of which fair market value is to be determined. I quote the entire passage.

"You are not to consider what the property or interest taken was worth to the defendants or any of them or to the owners of the leasehold or to the owners of the royalty interest for speculation or merely for possible usage, or what the defendants claim the property or leasehold interest or

royalty interest was worth for such purpose, nor what it would be worth to the Government for military purposes or for other purposes. You are not to consider the price that the property or interest would sell or lease for under special or extraordinary circumstances, but only the fair market value if offered in the market under ordinary circumstances for cash, a reasonable time being allowed to make the sale.

"The defendants in this case are not entitled to make a profit because the interests which they claim they have were taken from them by the Government. By that I mean that they may not obtain more compensation by reason of the condemnation proceeding than they would obtain as the fair market value of such interest if there had not been a condemnation proceeding. The Government's wartime necessity for the use of this property, for the particular purpose standing alone, cannot be considered in estimating the value of the property taken. Demand created by wartime necessity cannot be considered in estimating the value of the interest taken. Future income or speculative productive value contemplated is not a measure of condemnation value. Profits which might be derived from devoting the property to a particular purpose depends so much on conditions that cannot be forseen that they have no competency."

This passage was immediately preceded by a lengthy instruction, which I quote on the margin, clearly defining market value and advising the jury that market value is the measure of damages in condemnation.[1] The instruction of which my brothers complain, read in conjunction with the charge quoted in the footnote, I take to be good law. I had supposed it to be settled that the measure of condemnation value, as the trial court said, is market value, not "future income or speculative productive value contemplated" by the owner. Appellants appear to have thought so too. On the appeal they have not assigned the giving of this instruction as error, nor did they interpose any objection to it below; much less was the language singled out in the majority opinion designated by them as objectionable. The matter of speculative value was not mentioned in the objections interposed. Rule 51 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides, in part, that "no party may assign as error the giving or failure to give an instruction unless he objects there-

[1] "Now, just compensation means the equivalent in money of the interest taken so that the owner may be in the same position pecuniarily he would have occupied had the taking not occurred. Just compensation in condemnation is determined on the basis of the market value of the property or interest taken at the time of the taking by the Government. Thus the market value becomes the measure of damage. The test is not value for special purpose. It is the fair market value in view of all the purposes to which the property or interest is naturally adaptable. It is the highest value in terms of money which the property or interest will bring if exposed to sale for cash in the open market in the community in which it is situated, with a reasonable time to find a purchaser buying with full knowledge of all the uses and purposes to which it is adapted and for which it is capable of being used, the seller not being required to sell or the buyer not being required to buy at the time.

"In arriving at the amount of the market value of the interest taken by the Government in this case, that is, the amount in dollars and cents of the market value, you are not to consider what the interest taken was worth to the Government, for to allow that element to enter into your deliberation would be to make the Government's necessity the owner's opportunity. In other words, neither need for selling nor need for purchasing should be considered or should be taken into account. The location or physical characteristics, the advantages and disadvantages of the property or interest which is the subject of the condemnation are proper matters to [be] shown in evidence in determining market value. These are matters which naturally would be taken into calculation in forming a public and general estimate of the value of the property or interest taken and influence the minds of the sellers and buyers with relation thereto. Accordingly, to the extent that such matters are shown by the evidence, the Jury may properly consider the same in arriving at its conclusion as to the amount of the just compensation which should be paid."

to before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the ground of his objection. * * *" The court not only tosses this salutary rule out of the window but of its own motion finds reversible error in a charge which the federal courts have given so often that it has come to be regarded as a stock instruction.

I may say that appellants were represented throughout by able and highly vocal counsel who exhibited no difficulty in expressing themselves or in making their points clear. They have not complained that this instruction was wrong; and it has remained for my brothers to discover in their brief a fugitive intimation that somewhere in the instructions language is to be found which negatived counsel's request No. 40. The objection to the failure to give request No. 40 I quote on the margin.[2]

I wish to make some further observations with respect to this request, but for the moment it seems enough to say that, assuming its propriety, the giving of it was unnecessary. The court, as will appear from a reading of the instructions quoted in footnote 1 above, amply and correctly defined market value. These instructions do not exclude speculative considerations, whether probable or merely possible, which in fact "influence the minds of sellers and buyers."

It should be remembered that opinion evidence of value based on speculative considerations, as well as on what were claimed to be comparable sales in other localities, was freely admitted, none was excluded, and all was left for the consideration of the jury. Under the instructions counsel were entitled to urge and the jury were at liberty to take into account the speculative value of the interests taken insofar as it might be thought persuasive in the market; and appellants were entitled to no more than that. If the ground was fairly covered in the instructions, and I am satisfied it was, reversible error can not be predicated on the mere refusal to respond to this specific request even if it were in all respects proper. As said in Railway Co. v. McCarthy, 96 U.S. 258, 265, 266, 24 L.Ed. 693, "no court is bound to give instructions in the forms and language in which they are asked. If those given sufficiently cover the case, and are correct, the judgment will not be disturbed, whatever those may have been which were refused." The rule to this effect is universally followed.

The verbiage of request No. 40 was taken from an opinion of the Fifth Circuit in the case Eagle Lake Improvement Co. v. United States, 141 F.2d 562. The language was not there put forward as appropriate material for an instruction. It was employed in discussing an instruction which the court thought should not have been given. The trial judge had in substance charged the jury to find the mineral interests involved "valueless" unless from the evidence it was believed that a reasonable probability existed that oil or gas in paying quantities might be produced. The appellate court cited Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236, as being in substantial accord with this view, that is to say as holding that elements affecting value that depend upon occurrences which, though possible, are not reasonably probable, should be excluded from consideration as too speculative and conjectural to afford the basis for the judicial ascertainment of value. But the court pointed out that Texas law is more liberal where oil interests are involved, and a number of local decisions to that effect were cited. Further, it was observed that the mineral leaseholds in suit "are immediately adjacent to a currently productive oil field."

No productive field existed in the neighborhood of these leaseholds; they were in territory where, to put it mildly, nothing of commercial significance had been encountered. Nor do my associates point to any California law which would validate as an instruction the charge embodied in request No. 40. I may add that in this instance the trial court gave no instruction

2 "We also object to the refusal of the court to give our instructions Nos. 40, 41, and 43, those instructions having to do with the market value of the oil and gas leases. We object on the ground that the refusal to give those instructions is prejudicial error."

of the character found erroneous in the Eagle Lake Investment Co. case; and there is nothing in the opinion in that case to buttress the present holding that a failure to instruct in the language of request No. 40 constitutes reversible error. I am myself persuaded that a charge phrased as this request is would serve merely to confuse or mislead the jury in their endeavor to arrive at market value. After all, the question of what—whether much or nothing—a specific interest would bring if exposed for sale on the open market is not one of law, as this request assumes, but one of fact to be determined from the evidence.

I turn to other points stressed by the majority. One of these relates to a comment of the judge in the course of the trial on the incredibility of an item of testimony of the witness Bradford, and to the judge's remark concerning the state Corporation Department. Counsel for appellants objected to these observations as prejudicial. The court then stated in the presence of the jury "I am sorry to have made this comment. I will tell the jury to disregard it. It is just a comment of the court. * * * I will tell the jury to disregard the court's statement. The comment of the court was on the weight of the evidence and the jury is not bound by it. The jury can decide the case if and when it comes time for the jury to decide the case, according to their own lights and according to the instructions the court may give them at that time. The court, of course, has a right to make comments as to the weight of the evidence, but the jury is not bound by what the court says in that regard. It may form its own judgment. Does that instruction cover what you have in mind?" To which counsel for appellants replied, "Yes, your Honor. Thank you."

That would seem to have closed the incident even to the satisfaction of counsel, and I am unable to agree that its occurrence justifies a reversal. Appellants did not suggest that a mistrial be declared. On the contrary they appear to have preferred to take their chances on a favorable verdict.

Another matter found error by the majority is this sentence quoted from the instructions: "The reason why the court has expressed the opinion is that it appears to the court that there is no factual basis presented in the testimony of the expert witnesses for the defense upon which the opinion of value given by them can be said to rest." My associates construe this as a charge "that no evidence exists of the fact of a gas production giving a saleable value to the leasehold, when the record is replete with such evidence."

Neither here nor below did appellants interpret the court's language as a statement that there was no evidence of a discovery of gas in commercial quantities. Obviously the court meant to tell the jury no such thing, for, while confessedly there had been no factual demonstration of a commercial discovery, appellants' expert Norris had testified that in his opinion gas in commercial quantities was encountered at the time the well blew out. Appellants did object to the instruction of which the quoted sentence is a part, but not on the ground injected by the majority. Their objection was that the remarks exceeded the bounds of proper comment by the court in that it amounted to taking sides. The objection interposed is shown in full in the footnote.[3]

Here again my associates not only brush aside the requirements of Rule 51 but volunteer an interpretation of the judge's remark not so much as suggested by astute counsel who participated in the trial and who had doubtless prayerfully scrutinized the appeal record. Had there been reason to believe that the language used might be subject to the construction given it by my associates the duty rested on appellants of calling the matter specifically to the court's

[3] "Our objection to that particular instruction—and it was quite a long one—is that it exceeds the bounds of proper comment by a court in the instructions and amounts to taking sides. We object to the instruction as prejudicial error, on the ground that it denies the defendants in this action due process of law under the Fifth Amendment to the Constitution, on the ground that it is repugnant to the Fifth Amendment to the Constitution, providing that a defendant is entitled to just compensation in condemnation cases. We object to it on the ground that it is repugnant to the Sixth Amendment to the Constitution in that it denies the defendants in this action a fair trial by jury."

attention. In this way opportunity would have been afforded to correct any possible misapprehension and a new trial on that ground could readily have been avoided. Consult among the many authorities on the subject, Palmer v. Hoffman, 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645, 144 A. L.R. 719; Pennsylvania R. R. Co. v. Minds, 250 U.S. 368, 375, 39 S.Ct. 531, 63 L.Ed. 1039.[4]

Preliminary to a further word on this particular point I append below the whole of the remarks of which the quoted sentence was a part.[5] It seems to me clear from a reading of this instruction that the sentence is not open to the interpretation my associates give it. It amounts to no more than an expression of the court's opinion, expressly designated as such at the time, that the values fixed by appellants' experts lacked basis in fact. Even this analysis is less than fair to the trial judge. Defense experts had testified to total values of the leasehold and royalty interests in suit at sums as high as $662,000. The thought expressed by the judge was, not that these interests were without saleable value, but that in his opinion the values testified to by the experts were exaggerated to the point of being incredible.

I desire at this point to interpolate a word concerning the phrases "wells of proven profit," "proven commercial gas leases," "profitably producing gas well," and kindred examples of poetic license employed in the court's references to the leases in suit. There was no factual proof of a commercial discovery, and I am sure my associates would not want to leave the impression that there was. The evidence on the subject rested entirely in unverified and unverifiable opinion. Where a demonstrable commercial discovery of gas has been made the fact is not open to dispute; the volume of flow is susceptible of accurate measurement, and in such case opinion evidence of the fair market value of the property has a truly factual basis. Here the opinion evidence of value, so far as predicated on an assumed commercial discovery of unknown proportions, neither had nor could have anything tangible on which to rest.[6] It hardly rose to the dignity of an informed guess. Authorities like Montana Realty Co. v. Warren, 137 U. S. 348, 11 S.Ct. 96, 34 L.Ed. 681, dealing with the admissibility of evidence, are obviously inapposite.

The appropriate basis for the formulation of expert opinion on market value has been

4 In Palmer v. Hoffman, supra, it was said of this subject: "In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error. Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a new trial." This principle, constituting the rationale of Rule 51, has always been followed in the federal jurisdiction.

5 "Ordinarily, ladies and gentlemen, the court, as I stated to you before, abstains from expressing opinions as to the weight of the evidence. However, due to the somewhat apparent complexities of this case, and in order to be of assistance to the jury in the proper administration of justice, I believe it is my duty to make the following comment to the jury: In the opinion of the court the values fixed by the expert witnesses produced by the defendants in this case appear to the court to be so exaggerated as to make the testimony of those witnesses incredible. The opinion that I have expressed is just the opinion of the court. A Federal judge is permitted to make such a comment to the jury. The jury is not bound by the opinion of the court. The opinion is expressed as a part of the instructions as to the law for such aid as the jury wishes to make of it in determining the factual question. The jurors individually and collectively are entitled to disagree with the opinion of the court. You may have your own opinion and you can come to it. You are not bound in any manner in making a finding in accordance with the view expressed by the court. The reason why the court has expressed the opinion is that it appears to the court that there is no factual basis presented in the testimony of the expert witnesses for the defense upon which the opinion of value given by them can be said to rest."

6 The earlier flow of gas referred to in the majority opinion, said to amount to 100,000 to 125,000 cubic feet per day, confessedly was without commercial significance.

very recently announced by the Supreme Court in United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336, 147 A.L.R. 55, in this language: "It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken, and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons." Here appellants' witnesses failed to inform themselves of or to consider sales of other properties or mineral rights in the vicinity of these leases. Their expert Wents, after disavowing knowledge of various Northern California transactions, stated that they had no bearing on the problem. Bradford denied knowledge of trading in gas rights north of Madera County. These witnesses, when pressed for a basis for their estimates, claimed only that sales for comparable amounts had been made in Southern California oil areas, namely Bakersfield and Los Angeles. The qualifications of an expert witness to give opinion evidence of value is a question of law for the court, cf. United States v. 13,255.53 Acres of Land, 3 Cir., 158 F.2d 874, and I am unable to see how the court can be thought in error in commenting on these witnesses' lack of qualifying information.

In any event the comment was no more than the judge's expression of opinion on the evidence. The jury were amply advised that it was their province to decide the facts and to determine where the weight of the testimony lay. The judge was careful to inform them that they were not bound by his comments. In making them he was within his prerogative, and I am of the belief that the majority holding erroneously restricts this right and duty of comment. From the beginning, unlike the rule in many of the states, it has been settled in the federal jurisdiction that "the judge, in submitting a case to the jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention to parts of it which he thinks important, and express his opinion upon the facts; and the expression of such an opinion, when no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury, cannot be reviewed." Vicksburg, & M. Railroad Co. v. Putnam, 118 U. S. 545, 553, 7 S.Ct. 1, 2, 30 L.Ed. 257.

This vital prerogative of the judge was again stressed in the decision cited in support of the majority holding, namely Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321. A reading of that case demonstrates its inapplicability to the situation before us. There the judge, in instructing the jury in a criminal proceeding, charged them as follows: "And now I am going to tell you what I think of the defendant's testimony. You may have noticed, Mr. Foreman and gentlemen, that he wiped his hands during his testimony. It is rather a curious thing, but that is almost always an indication of lying. Why it should be so we don't know, but that is the fact. I think that every single word that man said, except when he agreed with the Government's testimony, was a lie." Of these remarks the Court said that "the trial judge did not analyze the evidence; he added to it, and he based his instruction upon his own addition. Dealing with a mere mannerism of the accused in giving his testimony, the judge put his own experience, with all the weight that could be attached to it, in the scale against the accused."

In the present instance the judge did not add to, subtract from or distort the evidence. If his comments are to be held out of bounds it seems to me that little of consequence is left of the federal judge's right to express his opinion on the evidence where he thinks the arrival by the jury at a just conclusion requires that he pursue that course. Here the judge informed counsel in advance of the argument of his purpose of commenting on the expert opinion of values, stating as his reason that if a verdict were returned in line with defense expert opinion he would feel obliged to set the verdict aside.

I would affirm the judgment.