R. H. PHILLIPS and Jessie E. Phillips, his wife, et al., Appellants,

v.

UNITED STATES of America, Appellee.

No. 15156.

United States Court of Appeals Ninth Circuit.

March 22, 1957.

**2**

Walter V. Swanson and Douglas A. Wilson, Yakima, Wash., for appellants.

Perry W. Morton, Asst. Atty. Gen., Roger P. Marquis, Washington, D. C., and Ronald R. Hull, Yakima, Wash., and William B. Bantz, U. S. Atty., Spokane, Wash., for appellee.

Before STEPHENS, ORR and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

Never niggardly in its standards for the compensation of the expropriated landowner, the Supreme Court has grown progressively more liberal in its canons for the reimbursement of those who are dispossessed through the exercise of the right of eminent domain.

In evaluating condemned real estate, the *total* worth of the property must be considered. It frequently has been remarked that expropriation is an action *in rem*. It is not concerned with the taking of the *rights* of different persons, but with the seizure of the property itself.

If we attempt to cut a condemnation proceeding into slices, it bleeds.

1. *Statement of Facts*

The appellants were the owners of a ranch in the eastern part of the State of Washington, of which the greater part, consisting of 33,213.13 acres, was taken by the appellee under the power of eminent domain.

Four condemnation proceedings involving the property were brought by the appellee against the appellants in the Court below. On October 26, 1955, the four cases were consolidated for trial.

On November 4, 1955, the jury brought in verdicts as follows:

Civil No. 452: Leasehold interest in 4,086.69 acres; taken on February 10, 1950; verdict, $5,062 per annum.

Civil No. 488: Leasehold interest in 3,034.84 acres; taken on July 5, 1950; verdict, $2,954 per annum.

Civil No. 762: Leasehold interest in 6,868.22 acres; taken on October 28, 1952; verdict, $7,240 per annum.

Civil No. 892: Fee interest in 33,213.13 acres; taken on February 15, 1954; verdict, $514,801.56.

Judgments on the verdicts were rendered on November 30, 1955.

During the trial, counsel for the appellants made repeated proffers of exhibits and testimony tending to prove "that this is an active leasing area now * * * and the reasons why it is, * * * and that there is a value incident to mineral rights as a result of its being an active leasing area." Specifically, counsel made the following offers:

1. The testimony of Valentine, a geologist of the Shell Oil Company, relating "to the presence of the factors necessary for exploration for gas and oil," with "data as to all of the existing leases in this field and showing almost all the land in and about this ranch to have been leased by various major oil companies."

2. The testimony of Beam, a former employee of the Carter Oil Company, to the effect "that he himself has bought mineral rights in such situations as the geologist will describe exist at this area on this ranch, and he himself has bought them for his personal account and for the account of leasehold mineral right companies".

3. Testimony that "in this region oil and gas have been developed, gas furnished for 14 years * * *."

4. Exhibit 96, "an option for mineral rights lease which encumbered this title

at the time the government took title to this property in February, 1954." The option is from Phillips, Haggerty, and Walter Swanson to Regimbal.

5. Exhibit 97, "the oil and gas lease which was executed by the owners of this property to the Shell Oil Company prior to the time that the government took this property in 1954." In making this offer, counsel for the appellants explained:

> "It is the theory of this offer that this jury should find the whole value of everything of this property that is taken—mineral rights, underground, surface and everything else —and that a division later is made between the parties to the lawsuit, all of the defendants."

The lease is from Phillips, Haggerty, and Swanson.

In connection with Exhibits 96 and 97, counsel offered checks "written for a year in advance", "as payments that have been made * * * In advance * * *. At the time of the taking * * *."

6. Exhibit 120, a deed of mineral rights from the appellants individually to the Cold Creek Company, composed of the appellants and the Swansons.

Later, counsel for the appellants elaborated at some length on these offers, naming the expected witnesses, and giving details of the proffered testimony, including the several factors that govern the decision as to drilling by the major companies, such as a source bed and an anticline area with a closure; corroboration by the geology departments of five other major oil companies in addition to Shell; reservations of mineral rights in recent sales of lands adjoining the property in question; dealings in areas similar to the one at bar, where there has not been a strike of oil, etc., etc.

We have no doubt that the appellants' offer of proof was sufficiently specific and circumstantial fully to apprise the District Court of the nature of the evidence that was sought to be introduced.

In any event, the District Judge ruled that he would not submit to the jury "the leases which have been received in evidence. They will be here for the purpose of showing the state of the title." The Court also instructed the jury as follows:

> "Now, there has been some mention made of mineral rights here. I think I should tell you that that question has been carefully considered by the Court and the Court has come to the conclusion as a matter of law, and you are instructed, that there has been shown no substantial value here for mineral rights and you are not to award any value for mineral rights. You are to utterly disregard any evidence that may have come in or any mention of that matter."

The appellants specify as errors the rejection of Exhibits 96 and 97—the lease option and the lease—offered as proof of the "Value of appellants' mineral estate, through rental payments and possibility of oil or gas production" and of the "Highest and best uses of land not inconsistent with agricultural use"; proffers of testimony of Valentine, the Shell Oil Company geologist, and Beam, formerly of the Carter Oil Company, supra; and the "Requirement by the Trial Court that the appellants conduct their case in accordance with the desires of the Court as to order and manner of proof," etc.

2. *In Compensation Cases, the Market Value of the Property Is to Be Fixed With Consideration of ALL Its Available Uses.*

We believe that the learned trial judge erred in apparently assuming that the appellee was obligated to pay the appellants for the appropriated land only "on the basis of its highest and best uses". Although the Court did make a passing reference to the fact that "property is to be valued with reference to all the uses to which it is adapted", on four separate occasions the District Judge stressed the view that "the constitutional provision of just compensation" for the taking of land is "on the basis of its highest and best uses." Two of those obser-

vations were contained in the Court's instructions to the jury.

 While the appellants are not specifying error in the Court's charge, we advert to these statements by the able trial judge as probably explaining, in part at least, his erroneous exclusion from evidence of the lease and the option referred to above, except "for the sole purpose of consideration by the Court as to the state of title"; and the "utter" exclusion of any other evidence relating to "mineral rights".

Be that as it may, we are convinced that the rejection of such evidence was error.

In the leading case of the Mississippi & Rum River Boom Co. v. Patterson, 1879, 98 U.S. 403, 408, 25 L.Ed. 206, Mr. Justice Field said:

> "In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be what is the property worth in the market, *viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted;* that is to say, what is it worth from its availability for valuable uses? Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it, and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated.
>
> "So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is, perhaps, impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future." [Emphasis supplied.]

Stressing the *totality of possible uses to which the land might have been put by the dispossessed owner,* in United States v. Chandler-Dunbar Water Power Co., 1913, 229 U.S. 53, 80–81, 33 S.Ct. 667, 678, 157 L.Ed. 1063, the Court said:

> "A 'strategic value' might be realized by a price fixed by the necessities of one person buying from another, free to sell or refuse, as the price suited. But in a condemnation proceeding, the value of the property to the government for its particular use is not a criterion. The owner must be compensated for what is taken from him; *but that is done when he is paid its fair market value for ALL available uses and purposes.* [Cases cited.]" [Emphasis supplied.]

Again, in Simpson v. Shepard, 1913, 230 U.S. 352, 434, 33 S.Ct. 729, 754, 57 L.Ed. 1511, Mr. Justice [later Chief Justice] Hughes observed:

> "The basis of calculation is the 'fair value of the property' used for the convenience of the public. [Cases cited.]
>
> "The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of *all* relevant facts." [Emphasis supplied.]

Finally, in United States v. General Motors Corporation, 1945, 323 U.S. 373, 374–378, 65 S.Ct. 357, 358, 89 L.Ed. 311, the Supreme Court considered "the ascertainment of the just compensation required by the Fifth Amendment of the Constitution, where, in the exercise of the power of eminent domain, temporary occupancy of a portion of a leased build-

ing is taken from a tenant who holds under a long term lease". Of such a situation, the Court said:

"The constitutional provision is addressed to every sort of interest the citizen may possess.

\* \* \* "The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking." [1]

3. *The "Element of Speculation" in Mineral Right Does Not Preclude Their Having an Ascertainable Market Value.*

■ "How could the jury arrive at a dollars or cents figure for a mineral interest except by pure guess?" rhetorically asks counsel for the appellee.

The Supreme Court has answered this question.

In Montana Railway Co. v. Warren, 1890, 137 U.S. 348, 352, 11 S.Ct. 96, 97, 34 L.Ed. 681, the Court said:

"There remains for consideration but a single point,—that there was admitted in evidence on the trial the opinions of witnesses as to the value of the land, which were not based upon the sale of the same or similar property, and were not therefore the opinions of persons competent to so testify. It appears that the land taken was a strip running through a mining claim, which had been patented and belonged to the defendants in error. The claim adjoined the Anaconda mining claim, which had been developed and worked, and demonstrated to contain a vein of great value. The claim in controversy had been developed so far as to indicate that *possibly, perhaps probably,* the same rich vein extended through its territory. It had not been developed so far that this could be affirmed as a fact proved. The strip taken ran lengthwise through the claim; and, upon the trial witnesses were permitted to testify as to their opinion and judgment of its value. It may be conceded that *there is some element of uncertainty in this testimony, but it is the best of which, in the nature of things, the case was susceptible.* That this mining claim, *which may be called 'only a prospect,'* had a value fairly denominated a 'market value,' may, as the Supreme Court of Montana well says, be affirmed from the fact that such prospects are the constant subject of barter and sale. Until there has been full exploiting of the vein its value is not certain, *and there is an element of speculation, it must be conceded, in any estimate thereof. And yet uncertain and speculative as it is, such prospect has a market value;* \* \* \*". [Emphasis supplied.]

In Eagle Lake Improvement Co. v. United States, 5 Cir., 1944, 141 F.2d 562, 564, the following language was used:

"Appellants' principal contention is that the charge of the court erroneously stated the law applicable to the issue of mineral value and was misleading, contradictory, and prejudicial. The instructions to which objection was made in substance charged that the jury should find the mineral interests valueless unless from the evidence it was believed that a reasonable probability existed that oil or gas in paying quantities might be produced. As held in Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236, elements affecting value that depend upon occurrences which, though possible, are not reasonably probable, should be excluded from consideration as

[1]. See also Standard Oil Co. v. Southern Pacific Co., 1925, 268 U.S. 146, 156, 45 S.Ct. 465, 69 L.Ed. 890; United States v. Miller, 1943, 317 U.S. 369, 373–375, 63 S.Ct. 276, 87 L.Ed. 336.

too speculative and conjectural to afford a basis for the judicial ascertainment of value. In Texas, however, a mineral lease is recognized by law as being property having a market value even if it covers undeveloped territory. Where oil interests are involved, a reasonable probability of successful development is sufficient to make leasehold estates of great value; *indeed, where there is a reasonable POSSIBILITY of production in paying quantities, mineral rights are a common subject of barter and sale, and therefore have a definite, ascertainable market value, even where the prospects of successful development are too speculative and remote to be 'reasonably probable.' In any event, such leases have a nominal value."* [Emphasis supplied.]

The Supreme Court of California has held that "It no doubt will always be more difficult to prove whether a reserved right in oil is valuable or not, much more so than such a right in fixed minerals; but it cannot be said to be impossible to do it." Southern Pacific Railroad Co. v. San Francisco Savings Union, 1905, 146 Cal. 290, 300, 79 P. 961, 964, 70 L.R.A. 221.

In this Circuit, the matter has been put beyond cavil by our decision in Cal-Bay Corporation v. United States, 9 Cir., 1948, 169 F.2d 15, 18, 19, certiorari denied, 1948, 335 U.S. 859–860, 69 S.Ct. 134, 93 L.Ed. 406, in which the owners of mineral rights under leases for oil and gas development "requested an instruction that, in the determination of the value of gas and oil leases, it may be based on the reasonable *possibility* of production in paying quantities, even though there were not a reasonable *probability* shown of such value". In that case, we quoted from the Eagle Lake case, supra, and we held:

"We think the district court erred in refusing such an instruction. We take notice that, in California, dis-covery in land of a reasonable probability of successful development of gas or oil gives great value to such land and that it has a market value *even where the prospects of possible successful development are too speculative to be reasonably probable.* The evidence, later quoted, shows there are hundreds of sales of lessor and lessee rights *in lands with such speculative value."* [Emphasis supplied.] [2]

■ By rejecting the three exhibits and instructing the jury to disregard "utterly" any evidence dealing with mineral rights, the Court foreclosed the appellants from making any proof as to either the "possibility" or the "probability" of the existence of mineral deposits on their land.

We think that such exclusion of evidence was error.

**4.** *The Lower Court's Rejection of the Proffers of Evidence Relating To Mineral Rights Affected ALL Four Cases.*

■ The appellee asserts that "Any error in exclusion of evidence as to mineral values does not justify a new trial as to matters submitted to the jury". In other words, it is contended that "The mineral claim has no connection with the three leasehold cases", and that even if we should "find that error was committed in the exclusion of the offered evidence, the retrial should be limited to mineral values."

We do not agree. C. Marc Miller, the appellee's appraiser, fixed the annual *agricultural* rental values of the three condemned leaseholds, exclusive of severance, as follows:

Civil Case No. 452, 4086.69 acres, $1,225.

Civil Case No. 488, 3034.84 acres, $759.

Civil Case No. 762, 6868.22 acres $1,370.

It will be seen that the average agricultural annual rental for all three leased

---

2. See also 3 A.L.R.2d 295–296.

tracts was less than 24 cents per acre. The appellants contend that if the rejected Exhibits 96 and 97 and the excluded testimony had been admitted, they would have established that as to 1,685.6 acres of the above leased property, they were receiving 25 cents per acre for mineral rental in addition to the agricultural value only, which, as we have just computed, was less than 24 cents per acre, on an average. In other words, if the jury had believed the proffered evidence, it would have at least doubled its verdict as to the leasehold condemnation of the acreage. The appellants should have been given their day in court in this matter.

Nor do we agree that "the verdict as to market value of the fee title should not be disturbed, since appellants' claim is not to enhancement of market value of the fee as shown by comparable sales but is for a separate mineral value in addition to the ranch value award".

The appellants' petition "for dismissal of mineral rights from the condemnation proceeding" was denied by the Court below. After verdict, the mineral values cannot now be separated, as the appellants point out. The error affects Civil Case No. 892—the so-called fee simple case—in that mineral values are additional elements to be considered in determining the reasonable market value of the fee interest. And, of course, as we have just seen, the mineral values are an integral part of the total leasehold value in the three leasehold cases—Nos. 452, 488, and 762.

In Eagle Lake Improvement Co. v. United States, 5 Cir., 1947, 160 F.2d 182, 184, apparently not noticed by counsel, the Court said:

"There is no merit in the contentions of appellants that the owners of mineral interests were entitled to a separate trial and that evidence of the market value of the property as a whole was not admissible. A condemnation proceeding is an action in rem. It is not the taking of

rights of designated persons, but *the taking of the property itself.* [Case cited.] When property is condemned, the amount paid for it stands in the place of the property and represents all interests in the property acquired. [Case cited.] The sum determined to be due for the taking is apportioned between the claimants, but, 'as between the condemner and the condemnee, the property is valued as a whole.' [Cases cited.]

"In accordance with state practice, issues both as to the value of the property as a whole and as to the value of each separate interest are sometimes submitted to the jury at the same time. [Cases cited.] However, we find no authority which holds that surface rights and mineral rights are such separate estates as to require separate trials as to valuation. [Case cited.]

"It becomes manifest that to uphold appellants' contention that separate valuation trials should be had would bring about confusion and injustice in condemnation cases. Separate trials would open the door to separate awards which might include valuation based on inconsistent uses of the property, and consequent duplication of values." [3]

The verdict in No. 892 fixed the "just compensation for the taking of defendants' [appellants'] property (fee ownership of 33,213.13 acres), including severance damage to the remainder of [appellants'] ownership to be $514,801.56". That verdict purported to establish the value of the entire interest in the property. But the first jury was precluded from taking into consideration the value of the property for oil and gas content. Full and complete justice in this case can be done only if the entire cause is submitted to a new jury, with proper instructions regarding mineral rights.

5. *Conclusion*

3. See also Treasure Co. v. United States, 9 Cir., 1948, 169 F.2d 437, 439, certiorari

denied, 1948, 335 U.S. 891, 69 S.Ct. 249, 93 L.Ed. 429.

We hold that in the instant case the market value of the property should have been fixed with consideration to *all* its available uses, including the mineral rights; that, despite the "element of speculation" involved in mineral rights, such rights have an ascertainable market value; and that the lower Court's rejection of the proffers of evidence relating to mineral rights tainted the results in all the four consolidated cases.

Accordingly, the judgments of the Court below are reversed, and the consolidated cases are remanded for a new trial in accordance with the views expressed in this opinion.

Reversed and remanded.