**UNITED STATES of America,**
**Plaintiff,**

**v.**

**237,500 ACRES OF LAND, MORE OR LESS, IN the COUNTIES OF INYO AND KERN, STATE OF CALIFOR-NIA, Frank R. Wicks et al., Defendants.**

**UNITED STATES of America,**
**Plaintiff,**

**v.**

**529,533 ACRES OF LAND, MORE OR LESS, IN the COUNTIES OF INYO, KERN AND SAN BERNARDINO et al., Defendants.**

**Civ. Nos. 311 ND, 3472 JWC.**

United States District Court
S. D. California,
Central Division.

Nov. 24, 1964.

Hansen & Dolle, Los Angeles, Cal., for American Pumice Co.

Manuel Real, U. S. Atty., and Richard J. Dauber, Asst. U. S. Atty., Los Angeles, Cal., for the United States.

HALL, District Judge.

Several pumice placer mining claims in each of the above cases were consolidated for trial and were tried together, without a jury.

The claims involved in Case No. 3472–JWC are all located in T.23–S, R.40–E, MDB&M, and are known as the "Brown Group." The claims of that group, concerning which evidence was offered and admitted as to the value and title, are "Tired Boy," a 160 acre claim; "White Gold;" a group involving two claims of 20 acres each, overlapping one another; "White Eagle No. 2," 20 acres; "Gray Boy," 20 acres; and "White Eagle Reserve," a 160 acre claim.

The claims involved in Case No. 311–ND are all located in T.21–S, R.38–E, MDB&M, and are known as the "Donna-Gill" claims. Those claims upon which evidence was offered and admitted as to value and ownership are "Donna No. 3 and No. 4" and "Ray Gill No. 31."

## OWNERSHIP
### [Brown Group]

The United States stipulated with defendant American Pumice Company that on the date the Declaration of Taking was filed in Case No. 3472–JWC, the "Brown Group," except "White Eagle Reserve," were owned by the American Pumice Company.

The only one putting on any case for title or valuation or appearing as a party in interest at the trial as a claimant, owner, or defendant, was the American Pumice Company. During the trial, counsel for the Government objected to the introduction of testimony offered by the American Pumice Company concerning the value and ownership on the ground that the American Pumice Company was not shown to be the owner on the date the Complaint was filed, in that a quit-claim deed to the American Pumice Company from the Pepperdine Foundation and Flotation Systems, Inc. was made after the Complaint was filed [Ex. Z], which the Government then, for the first time, asserted was in violation of 31 U.S.C. § 203.

■ The quit-claim deed was dated June 21, 1944, which was after the Complaint was filed in No. 3472–JWC on February 23, 1944. The Declaration of Taking was filed October 19, 1945—(see Stipulation filed March 28, 1963). That is the date the Government took possession. "The filing of a petition in condemnation without taking possession is not a taking. The condemnor may discontinue or abandon his efforts." [23 Tracts of Land v. U. S. (6 Cir. 1949) 177 F.2d 967 at 970]. This case was cited with approval in U. S. v. Dow (1958) 357 U.S. 17, at page 22, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 where the Supreme Court said: "The owner at the time the Government takes possession 'rather than the owner at an earlier or later date, is the one who has the claim and is to receive payment.' "

Moreover, the quit-claim deed by its terms was not an assignment but was a relinquishment to the American Pumice Company of whatever title, "if any," was in the Pepperdine Foundation and Flotation Systems, Inc. No claim then existed against the Government under 31 U.S.C. § 203, nor did one come into existence until the Government took possession under its Declaration of Taking on October 19, 1945.

■■ The Government is bound just as much by its stipulation as private counsel would be. The statute not only authorizes, but makes it the duty of the United States Attorney to "[p]rosecute or defend, *for the government, all civil actions, suits* or proceedings in which the United States is concerned." [28 U.S. C. § 507(a) (2)]. This is a civil action or suit. When an action is once filed, to which the United States is a party, and has appeared, the United States Attorney has full power to bind the United States. An admission by counsel for the United States, made by way of stipulation of fact and made as a part of the record, and relied upon by the opposing party, is a most solemn and binding act. [King v. Edward Hines Lbr. Co. (D.C.Or.1946) 68 F.Supp. 1019]. Especially is this so where, as here the Government ousted the defendants from the property 20 years before the case was brought to trial, and no motion was made to be relieved of the stipulation, and no notice given of an intention to renege until after the trial was started.

■ The objection of the Government to the introduction of any evidence either as to value or ownership was overruled on the basis that the Government was bound by the Stipulation. But as a precaution, counsel for the American Pumice Company offered, and the Court permitted, evidence to the effect that the American Pumice Company was the owner, and in possession, of the claims in No. 3472–JWC on the date of filing the Complaint and on the date of filing the Declaration of Taking.

It developed early in the trial of five weeks that many of the original records, relating to both the "Brown Group" in Case No. 3472–JWC and the "Donna-Gill" claims in Case No. 311–ND, concerning the ownership and operation of both groups of claims, were in the office of George Acret, an attorney who died some years ago and whose wife thereafter destroyed all of the records (originals and copies) which Splane (one of the principal actors in the American Pumice Company in 1944 and before, and in other Companies which he operated) had left in the office of Acret. Even so,

the evidence is sufficient to preponderate in favor of the ownership and possession of the Brown claims in Case No. 3472–JWC in the American Pumice Company on the date of filing the Complaint and on the date of filing the Declaration of Taking.

On the basis not only of the Stipulation, but also from the evidence, I conclude that the American Pumice Company was the owner of the mining claims involved in Case No. 3472–JWC, except "White Eagle Reserve," on February 23, 1944, the date of the filing of the Complaint, and on the date of the filing of the Declaration of Taking, to-wit, October 19, 1945.

No stipulation existed as to the ownership of "White Eagle Reserve." The American Pumice Company attempted to prove ownership by virtue of recording an *Amended* Notice of Location in 1962, long after this action was commenced. An amendment contemplates a change in, or correction of, something which did or does exist. I have examined my notes and have read the entire transcript again, and I cannot find any evidence that there was ever any *original* Notice of Location of the so-called "White Eagle Reserve." The witness Zimmer testified that he located the land and discovered a pumice deposit, and did some assessment work, but I find no testimony to the effect that there was ever a Notice of Location either posted on the property or recorded in the County Recorder's office until the Amended Notice of Location was recorded as above-mentioned. And the evidence is unconvincing that there was such possession of, and work on, that claim to bring it within the provisions of 30 U.S.C. § 38.

██ While an Amended Notice of Location can be made, and the Statutes are to be liberally construed in respect to posting, recording, and amending Notices, nevertheless there cannot be an *Amended* Notice of Location if there has been *no original* Notice of Location.

██ I hold that the claim to the White Eagle Reserve by the American Pumice Company is invalid.

## OWNERSHIP
### [Donna–Gill Claims]

██ Without tracing the evidence, it is sufficient to say that the evidence preponderates in favor of the ownership of the American Pumice Company of a lease and option on Donna No. 3 and No. 4, and Ray Gill No. 31, on the date the Complaint in Case No. 311–ND was filed on March 20, 1945, and on the date an Order for immediate possession was obtained, to-wit, March 30, 1945, and on the date the American Pumice Company vacated the premises on May 29, 1945.

An unusual and special problem of law arises in connection with this group of claims involved in Case No. 311–ND.

When the Complaint was originally filed, it included the Donna-Gill group. Thereafter, on the recommendation of the then appraiser for the United States (who was a valuation witness for the defendants at the trial), the lines of the Military Reservation were contracted so as to exclude Donna No. 3 and No. 4 and a portion of Ray Gill No. 31 from the boundary of the actual taking. A substantial portion of Ray Gill No. 31 remained within the boundaries. It is to be kept in mind that the American Pumice Company, pursuant to a notice of an Order for immediate possession, vacated the premises, dismantled its machinery, and closed the operation of the mines, on May 29, 1945. The revision of the boundaries and the Second Amended Complaint, in accordance with the revision, was made on August 22, 1945, but there was no evidence that this Amended Complaint was ever served upon the defendant American Pumice Company or any of its agents or attorneys as required by F.R.Civ.P. 5(a). I find that it was not. Nor is there any evidence that the American Pumice Company was ever apprised of any order permitting such amendment, or of the amendment itself. I find that it was not. To make matters further complicated, no Order of dismissal or Petition for dismissal of the Complaint in Condemnation, concerning Donna No. 3 and No. 4, or the portion of the Ray Gill claim No. 31 excluded

on August 22, 1945, was made until more than 11 years after the American Pumice Company had been excluded, that is to say, the Order of dismissal of Donna No. 3 and No. 4 and the portion of Ray Gill No. 31, which was excluded, was not made until September 24, 1956. I find that this Order of dismissal was obtained without notice or pretence of notice to the American Pumice Company, and that no notice of this Order of dismissal was ever served on the American Pumice Company.

F.R.Civ.P. 71A(i) (3) did not take effect until August 1, 1951, six years after the original complaint was filed. By the Order of the Supreme Court adopting Rule 71A [341 U.S. 962], the Rule governs "all further proceedings in actions then pending, except to the extent that in the opinion of the court its application in a particular action pending when the rule takes effect would not be feasible or would work injustice, in which event the former procedure applies."

Rule 71A(i) (3) provides that actions involving condemnation shall not be dismissed as to any part of the property of which plaintiff has taken possession or in which plaintiff has taken title or a lesser interest, but the court shall award compensation for the title and interest taken. Its text is:

"(3) *By Order of the Court.* At any time before compensation for a piece of property has been determined and paid and *after motion and hearing,* the court may dismiss the action as to that property, *except that it shall not dismiss the action as to any part of the property of which the plaintiff has taken possession or in which the plaintiff has taken title or a lesser interest, but shall award just compensation for the possession, title or lesser interest so taken.* The court at any time may drop a defendant unnecessarily or improperly joined." (Emphasis added)

The former procedure in California is found in Code of Civil Procedure, Section 1255a, as amended by statute in 1933, and again amended in 1961.

Prior to 1961, under the California procedure, the plaintiff, that is, the condemnor, could abandon the proceedings at any time after filing the Complaint and before the expiration of the final judgment, in which event the defendants were allowed only their costs, including expenses and attorneys' fees.

It would work an injustice not to apply Rule 71A(i) (3), F.R.Civ.P., in view of the fact that after American Pumice Company surrendered possession, pursuant to the Order for immediate possession, someone else gained a very substantial benefit from such surrender, as seen from the following facts:

Splane, who was in active management of the American Pumice Company, severed his relations with that company early in 1945 before the Complaint was filed in Case No. 311–ND on March 20, 1945; thereafter and in 1946 (after the Donna-Gill claims were excluded by revision of the boundary lines on August 22, 1945, and after American Pumice had surrendered possession to the Government on May 29, 1945), he took leases and options on the Donna-Gill claims from Gill and Wicks, and operated the mines; in 1947, he sold his interest which he had thus acquired on the claims, and other assets of the pumice business to the witness Newby who paid a total of $270,000 therefor, divided as follows: $100,000 to Splane; $15,000 to Gill (the locator of the "Gill" claims) ; $5,000 to Wicks (the locator of "Donna" claims); and $150,000 in liabilities of Splane. Thus, American Pumice, because it had surrendered the claims to the United States in May, 1945, and dismantled its machinery and equipment, and ceased operations, and had no notice of the revision of boundaries, was actually precluded from either operating the claims or making a sale thereof.[1]

---

1. There was no evidence of the value assigned to Donna No. 3 and No. 4, or Ray Gill No. 31, and the sale from Splane to Newby included five other claims and three mill sites, as well as machinery, equipment, et cetera.

In view of the lack of notice, as above set forth, to the American Pumice Company, and in view of the fact that it was in possession of and operating the Donna-Gill claims as active mines on the date of the Order for immediate possession, and in view of the fact that it surrendered possession and dismantled its machinery, and closed its operations, and someone else benefited from its surrender of possession, the Court concludes that it would work an injustice to apply the formerly prevailing California procedure, and holds that the American Pumice Company is entitled to the application of F.R.Civ.P. 71A(i) (3); and thus, to just compensation for its interest in said claims as if there had been no revision of boundaries, no amendment of the Complaint, and no Order of dismissal.

## VALUATION

The date of the Declaration of Taking of the Brown group in Case No. 3472–JWC was October 19, 1945, and the date of the Order for immediate possession on the Donna-Gill claims, Case No. 311–ND, was March 30, 1945. These would technically be the dates of valuation, but the property being mining property producing material with limited specialized uses, the Court does not feel bound, under the cases, to exclude evidence of subsequent occurrences which go to valuation, and result in no disadvantage to either party. The reason for the rule is that a condemnee cannot profit from enhancement resulting from the taking. Here, no advantage resulted or could result from the taking. The market for the product was the metropolitan area centering around Los Angeles—not the wild and barren desert used for a missile range. The evidence of sales to the Military Base, after taking, is stricken except for the limited purpose of showing that the mines were operable and operating.

The mineral deposits are pumice. It weighs about 500 pounds per cubic yard as against about 2,500 pounds per cubic yard of dry sand. It is used industrially as an abrasive, and agriculturally as a soil conditioner. But its principal use is as an aggregate for concrete and cement brick and cement building blocks.

The nature of pumice and its peculiar value as an aggregate for concrete and for cement blocks is illustrated by a short quotation from Government Exhibit 9–A, being Bulletin 174, published in 1956 by the Division of Mines, State of California, Department of Natural Resources, at page 110 where it states, among other things, as follows:

"A slab of pumice concrete one inch thick weighing 75 pounds per cubic foot has six times the insulation value of a comparable slab of conventional concrete; a wall of pumice concrete four inches thick with a compressive strength of 2,000 pounds per square inch would transmit less than half as much heat as a similar wall of conventional concrete.

"Three houses made of pumice concrete have been fired under controlled conditions for the purpose of determining the fireproof nature of pumice concrete. The houses were built in Belgium, England and California, and in each house the fire was built inside with gasoline or oil-soaked wood, and temperatures carefully noted by pyrometric cones and thermocouples. In one house, the temperature reached 1800 degrees Fahrenheit, in another steel windows and door frames warped out of shape, and in all three the sudden quenching by cold water showed no damage to the pumice concrete.

"Well designed pumice concrete consistently demonstrates twice the accepted value of sand and gravel concrete, relative to fire rating. Pumice concrete not only maintains its rigidity under high heat, but protects structural members through its high insulating property which is equal to the highest of any of the lightweight aggregates that attain structural strength."

The pumice produced from some or all of the said claims was used in many buildings in the Metropolitan area of Los Angeles. It was sold to the U. S. Gypsum Company for use in its products, and also in large quantities to local manufacturers of accoustical plaster, such as Gladding-McBean Company who market their products under the name of "Keelite." It was used in roofing. These claims supplied 90 per cent of the users of light-weight aggregate in Southern California. It was shipped as far north as Salinas and south as far as San Diego and the Imperial Valley. Both the Donna-Gill and the Brown group were active producing mines before, and on, the date of taking.

The evidence is uncontradicted that on and long before the date of taking there was a substantial market within reasonable hauling distance for the pumice in these claims. This had declined during the war years, as did all other building material business because of the almost complete stoppage of private building during those years. At the time of taking, the indications were for a large and substantial increasing annual demand, due to the incipient building boom which had already started in Southern California.[2]

While the properties are approximately 50 miles apart, they were both operated by the American Pumice Company. They were complementary and not competitive to one another, and both were so operated by that Company. They were complementary to one another because the claims in the Donna-Gill group were in the area where the pumice was mined by open pit methods and stockpiled. It would get wet from snow and rain, and it cost about $4.00 a ton to dry it, whereas the pumice in the Brown group could be mined by a very simple and cheap method, from underground, by tunnels and "pillars" with a shovel and drag line to carry the pumice to a crude wooden chute which would dump the material into a truck and carry it direct to market. (See Exhibits BA and BB). Thus it did not need to be dried as did the pumice in the Donna-Gill group when it became wet. The mining operations on both groups were simple and not expensive.

Before discussing the elements of value, it should be observed that the testimony of government witnesses had no probative value. They spent three or four hours examining ("browsing" is the testimony) each group of claims, and that was many years after the taking. Their inspection was casual. One of them didn't make up his mind as to value until the day before he testified. And from his manner, I judge he was uncertain then of his expressed opinion. They made no effort to make any calculations of the amount of pumice in place. And there is nothing else of value on the properties. Under the mining laws, they could not be used for any other purpose such as ranching, cabin sites, resort purposes, or other like uses. Thus, they must be valued for the pumice on them.

 Another thing which neither the Government witnesses nor government counsel seemed willing to take into consideration was that in mining claims, as in oil and gas, a lease with the lessee paying a royalty to the owner, with or without an option to buy, is frequently, in fact almost always if mineral in any quantity is present, of much greater value than the undeveloped claim. This is a fact which is so well known in mining and the petroleum industry that the Court takes judicial notice of it. It is illustrated in Government's Exhibit No. 13. It is the Memorandum to the Government which Mr. Sommer-Schmidt had written when he was employed by the government. It states that the value of the Ray Gill No. 31 claim was $8,000, *but that it contained $500,000 worth of pumice!* This well-known fact is further illustrated by the testimony of Newby who paid $15,000 to Gill and $5,000 to Wicks (the locators of Donna No. 3 and

2. The total pumice production in California dropped from 85,309 tons in 1941 to 21,154 tons in 1943, but increased to 89,209 tons in 1945. [California Division of Mines Bulletin No. 139].

No. 4 and Ray Gill No. 31), but $250,000 to Splane (and his creditors) who held the lease and option from Gill and from Wicks. The testimony in the record is to the effect that it was upon the recommendation of Sommer-Schmidt that the Government changed the boundary line so as to exclude the Donna-Gill claims. It must be emphasized that the *fee title* to all of the claims always remained in the United States, and the only thing that was obtained by the original locators or any lessee of the original locators was the right to possess and mine the claims. It is easily comprehensible and reasonable that Ray Gill and Wicks, with rights inuring only from location and notice thereof, would accept a per ton royalty and agree to sell their rights for a comparatively small total sum to a company which was willing to risk a much larger investment to develop and work the mining claims and market the product. Thus what the government took, for which just compensation is to be fixed, is the combined valuation to the lessor of his location rights and to the lessee of his lease and option.

The Government, throughout the trial, insisted that the only method of fixing fair market value or "just compensation" was by comparable sales.

While it is true that many District and Circuit courts have adhered strictly to the proposition that the only way to ascertain just compensation is on the basis of sales of comparable property, the Supreme Court has not been so inflexible. Examples of this flexibility in considering different elements for fixing value are found in U. S. v. General Motors (1945) 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311; U. S. v. Petty Motors Co. (1946) 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729; U. S. v. Causby (1946) 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; and Kimball Laundry v. U. S. (1949) 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765.

The mineral, pumice, being of a peculiar nature and of limited use, as contrasted, for instance, with gold, silver, iron, copper and the like, instances of comparable sales are simpy not available.

There was no other comparable property. It is difficult to see how pumice claims can be comparable to one another unless adjacent or nearly so, as the quantity, quality, mining costs and access to market vary with each property. Thus there were no comparable sales. Nevertheless, the Court must seek in these cases some standard by which to evaluate "just compensation."

In Miller v. U. S. (1943) 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, upon which the Government so heavily relies here for the comparable sale rule, the Court states:

"It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose. * * * Courts have had to adopt working rules in order to do substantial justice in eminent domain proceedings."

The courts (this one not excepted) have had much difficulty in trying to "adopt working rules" in fixing "just compensation" in eminent domain proceedings for rights in mining claims and deposits in place of natural resource material. The cardinal rule which must never be forgotten is the oft-quoted statement of Mr. Justice Holmes in Boston Chamber of Commerce v. Boston (1910) 217 U.S. 189, at 195, 30 S.Ct. 459 at 460, 54 L.Ed. 725—"[T]he question is, What has the owner lost? not, What has the taker gained?"

Judge Carter of this court reviewed some of the cases in U. S. v. Land in Dry Bed of Rosamond Lake (1956) D.C., 143 F.Supp. 314, where drilling mud used in oil wells was involved. He concludes, among other things, that the quantity of the substance and the going unit price therefor may be considered *only* as a *factor* in fixing fair market value. His opinion is in disagreement with the Courts of Appeal in the Third, Fourth, Eighth and Tenth Circuits, as well as the District of Columbia.

The last-mentioned cases are National Brick Company v. U. S. (1942) 76 U.S.

App.D.C. 329, 131 F.2d 30, (sand); Clark v. U. S. (8 Cir. 1946) 155 F.2d 157 (lumber); Cade v. U. S. (4 Cir. 1954) 213 F.2d 138 (granite); U. S. v. Silver Queen Mining Company (10 Cir. 1960) 285 F.2d 506 (copper and silver); U. S. v. Iriarte et al. (3 Cir. 1948) 166 F.2d 800, cert. den. 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 [per square meter and per lot].

I agree with the reasoning of the last above-cited cases.

The Silver Queen Mining Company case, supra,[3] points up the difficulty of being "definition bound," in 285 F.2d 506, page 510, which states:

> "[T]he required proof [of value] need rise no higher than the circumstances permit. Some speculation is inherent in the ascertainment of value of all resource property, be it mineral, oil, gas or otherwise, and if the quality of proof of value follows the custom of the industry, is the best available, and is sufficient to allow the jury or court to make an informed estimate as to the fact of value, such proof is sufficient to meet the burden."

The Court then quoted at length from Montana Railway Co. v. Warren (1890) 137 U.S. 348, at 352, 11 S.Ct. 96, 97, 34 L.Ed. 681, as follows:

> " * * * The strip taken ran lengthwise through the claim; and upon the trial witnesses were permitted to testify as to their opinion and judgment of its value. It may be conceded that there is some element of uncertainty in this testimony, but it is the best of which, in the nature of things, the case was susceptible. That this mining claim, which may be called 'only a prospect,' had a value fairly denominated a 'market value,' may, as the supreme court of Montana well says, be affirmed from the fact that such prospects are the constant subject of barter and sale. Until there has been full exploiting of the vein, its value is not certain, and there is an element of speculation, it must be conceded, in any estimate thereof. And yet uncertain and speculative as it is, such prospect has a market value; and the absence of certainty is not a matter of which the railroad company can take advantage when it seeks to enforce a sale. Contiguous to a valuable mine, with indications that the vein within such mine extends into this claim, the railroad company may not plead the uncertainty in respect to such extension as a ground for refusing to pay the full value which it has acquired in the market by reason of its surroundings and possibilities. * * *"

The court, in the Silver Queen case, approved evidence relative to the custom of the industry in the development and ultimate sale of mining property with such custom particularized to the claims in suit, as well as estimates of the possible extent of the deposit, the cost of development, and the ultimate reward to the owners if the mines should be developed commercially.

The Court in National Brick Company v. U. S., supra, reversed the trial court for refusing to allow estimates as to the value of the brick-sand and building-sand in place per ton, and limiting the appraisement as to the value of the real estate only, and said (131 F.2d at page 31):

> "Obviously, the Court was originally of opinion that the presence on the property of the sand bank forty to ninety feet high, containing 300,000 cubic yards of pure sand was of no consequence in determining the value of the property taken, and that the added value by reason of the presence of the sand should not be considered. On this theory most of the evidence of the additional value of the sand in the bank as it was and of the additional value of the property by reason of presence of the sand was rejected.

3. The Government experts in that case fixed a nominal value, as here.

"This opinion of the Court was, of course, wrong, for no rule is better established than that the special value of land due to its adaptability for use in a particular business is an element which the owner of land is entitled to have considered in determining the amount to be paid in just compensation.

"So much as this was said by the Supreme Court in Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644. And we know of no other evidence by which the jury could be properly guided in determining the value of the property than to be told the per ton value of the sand as it lay, or, without this knowledge, how the jury could ever have reached a judgment based on anything more than guess or speculation."

Evidence of the quantity of resource material in place has been disfavored where there was no evidence of a prior or existing market for the material on the date of taking.

Cameron Development Co. v. U. S. (5 Cir. 1944) 145 F.2d 209, and Rayno v. U. S. (1st Cir. 1943) 136 F.2d 376, cert. den. 320 U.S. 776, 64 S.Ct. 90, 88 L.Ed. 466, are such examples of no prior market. Even so, in the latter case, the court said if a market was found, from the evidence, aside from the Government market, "this logically made it relevant to inquire into the unit price of the hardpan in the bank and its amount." [136 F.2d 379]. In Cementario Buxeda v. People (1952) 196 F.2d 177, cert. den. 344 U.S. 876, 73 S.Ct. 170, 97 L.Ed. 678, the First Circuit approved National Brick, supra, and applied its reasoning in

holding that the per plot value of burial sites was proper in a cemetery condemnation. It reversed the trial court. Thus, the First Circuit agrees with the Third, Fourth, Eighth, Tenth and the District of Columbia.[4] Here, in this case, there was not only a prior market, but an existing and rising one on the date of the taking, and the defendants were in active operation of the pumice mines, and the land had no other value.

Valuation is made so often on the per acre value of land that it is unworthy of citing any case using the per acre as a unit. In U. S. v. Iriarte et al. supra, the court approved evidence of the unit value per square meter of land and the unit value per lot of undeveloped land.

And this is just common sense.

The Supreme Court took the same common sense approach in Monongahela Navigation Co. v. U. S. (1893) 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463, where it held that the toll for each use of a canal under condemnation "must enter into and largely determine the matter of value." A canal can only be used for one thing—transportation. Likewise the property here has only one use—production of pumice. If the toll on each use of the canal, which of course had a limited capacity and which could not be used for any other purpose, "largely determines the matter of value," then it is equally logical that the limited quantity in tons of pumice and its reasonable value in place "must enter into and largely determine the matter of valuation" of these claims. To do otherwise would be, to paraphrase a line from National Brick Co. v. U. S., supra, 131 F.2d at page 31, to—leave the parties (and the Appellate Court) "bewildered as to the proper ele-

---

4. The Ninth Circuit in Cal-Bay v. U. S. (1948) 169 F.2d 15, Cert. den. 335 U.S. 859, 69 S.Ct. 134, 93 L.Ed. 406, and Phillips v. U. S. (1957) 243 F.2d 1, reversed the trial court for failure to give an instruction or refusing evidence to the effect that the value of oil and gas leases can be based on the "reasonable *possibility* of production in paying quantities, even though there were not a reasonable *probability* shown of such value." (Emphasis not supplied). To the same effect is Eagle Lake Improvement Co. v. U. S. (5 Cir. 1944) 141 F.2d 562, 564. In the instant case, numerous borings and extensive measurements of the ore in place were made so that the existence of the pumice and its quantity were not only more than reasonably possible, but capable of reasonably accurate estimates of quantity and quality.

ments to be taken into consideration in ascertaining the fair market value of the property."

The long and short of it is that there is *no other factor* of value in these properties except the quantity and quality of pumice and its value per ton in place on the date of taking.

The defendants produced three expert witnesses—F. Sommer-Schmidt, C. R. King and F. H. Frederick. Each of them based his estimate of value on carefully-made measurements, test holes, and surveys which, according to the evidence, took 17 days to make. Each of them testified at length and gave an estimate of the total reserve of pumice in each claim, the number of years before the reserves would be exhausted, and the "present" value, and other elements they considered.

In fixing the value, consideration must be given to the fact that another lightweight aggregate for mixing concrete, known as "bloated" clay or "expanded" shale had made its appearance on the market in competition to pumice several years prior to the filing of the within suits. While the "expanded" shale has to go through a more or less inexpensive manufacturing process, it, nevertheless, has the advantage over pumice of large deposits of a common material in the immediate vicinity of markets, and a steam shovel handling of raw material in "mining" it.

Transportation to market and mining costs are two of the largest items of cost in the pumice located on the claims involved in this case. A prudent and willing buyer and a prudent and willing seller on the date of taking would have had to consider the price competition from the production of "expanded" shale in figuring the number of years the pumice in these claims could compete in the Southern California market.

None of the experts indicated that any weight was given to this time factor in fixing values. The only evidence of it came from one of the witnesses who mentioned the competition of that prod-

uct, and from Government's Exhibit 9–A. (California Division of Mining Bulletin 174) compiled in 1956.

While "just compensation" must be fixed as of the date of taking, and evidence of subsequent events is generally to be excluded, I do not think that rule is so harsh as to entirely exclude evidence on a vital point when there is no other evidence available. Figures 13 and 15 in Bulletin 174 show a plunging decline in the use of pumice in concrete, not only in California, but throughout the United States, beginning in 1951 when its competitor "expanded" shale made its appearance on a large scale.

Defendants' experts estimated the deposits on the claims in suit to have lives at varying annual rates of production from 4.1 years to as many as 33 years. In view of their failure to take into consideration the limiting effect of "expanded" shale on the life of a market for pumice, I cannot accept their figures as to the life of the market for pumice from the claims in suit. From the whole evidence in the case, I find as a fact that the life of such market would be five years.

The opinion of defendants' expert witnesses, while expressed as "present" value, is, when analyzed, in effect, an estimate of the value per ton in place of the total tons of pumice. The opinions on net value per ton in place varied between Schmidt, King and Frederick, but I accept Schmidt's opinion as the most reasonable one on this point which amounts to approximately 50 cents per ton in place. I find that figure as the value per ton of pumice in place on each of the claims in both suits on the date of taking.

The defendants' witnesses likewise varied in the total annual production from each claim. I accept the most conservative figures of defendants' witnesses, and find that the annual production from Donna No. 3 and No. 4 to be 31,000 tons per year with a five year life. This is a total of 155,000 tons. Valued at 50 cents per ton in place, it amounts to

$77,500, which I find to be the fair market value of the tons in place on Donna No. 3 and No. 4 on the date of taking.

From the whole evidence, I find that the American Pumice Company was obligated to pay a total royalty to the locators of Donna No. 3 and No. 4 of $5,000, and here, the value to the locators was $5,000. Thus, the award to the American Pumice Company for Donna No. 3 and No. 4 would be $77,500 minus $5,000, or a total of $72,500, which I find to be just compensation to the American Pumice Company for its lease and option on those claims on the date of taking.

 Wicks, the locator of Donna No. 3 and No. 4, after this condemnation suit was filed, received $5,000 for a quit-claim of his interest in those claims, which money came from the witness, Newby. This was paid in 1946. No one is now claiming the right to receive that sum as successor of Wicks, and it is unnecessary to determine if it comes within the prohibition of 31 U.S.C. § 203. The American Pumice Company should not receive it as its total interest was the lease and option. And it cannot be paid

for what it did not own on the date of taking.

On Ray Gill No. 31, I accept the testimony of the witness Frederick that the market would absorb a production of pumice of 19,000 tons per year. This is a total of 95,000 tons over the five year market life of the market for pumice. I accept Schmidt's valuation of 50 cents per ton in place, which gives a total valuation of combined locators' interest and the lease and option of the American Pumice Company of $47,500 on the date of taking. The total value to the locator Gill on that date was $10,000 minus any royalties received [Exhibit W]. But he is not claiming any award, and no one is claiming as his successor. Hence no award will be made for the locators interest. Furthermore, he has waived it [Ex. CN]. Deducting that $10,000 from the $47,500 leaves $37,500 which I find to be just compensation to the American Pumice Company for its lease and option on Ray Gill No. 31 on the date of taking.

I find from the evidence that the annual production and the life of the market from "Tired Boy," "White Gold," "White Eagle," and "Gray Boy" to be as follows:

| | | |
|---|---|---|
| Tired Boy | — 9,800 tons per year for 5 years ....... | 49,000 tons |
| White Gold | — 8,100 tons per year for 5 years ....... | 40,500 tons |
| White Eagle | — 2,000 tons per year for 5 years ........ | 10,000 tons |
| Gray Boy | — 3,000 tons per year for 5 years ....... | 15,000 tons |

Total tons in Brown group ..........114,500 tons

114,500 tons at 50 cents per ton in place ...........$57,250.

————◆————

Inasmuch as the Court has heretofore found and the Government has stipulated that the American Pumice Company was the owner of the last above-mentioned claims on the date of taking, the award to the American Pumice Company is in the total sum of $57,250.00.

Under the terms and provisions of F.R.Civ.P. 52(a), the Court finds that the facts and conclusions of law set forth

herein are sufficient so that it will be unnecessary to prepare Findings of Fact and Conclusions of Law.

The parties will be entitled to judgment as above set forth upon preparation and presentation of a judgment for approval as to form. The judgment will provide that the claims concerning which no evidence was produced as to value are entitled to no award.