Francis SKAW et al., Appellants,

v.

UNITED STATES, Appellee.

Appeal No. 84-614.

United States Court of Appeals,
Federal Circuit.

July 23, 1984.

Thomas W. Frizzell, Missoula, Mont., argued for appellant.

Blake A. Watson, Washington, D.C., argued for appellee. With him on the brief were F. Henry Habicht, II, Asst. Atty. Gen., David C. Shilton, Susan J. Rubin, and James B. Snow, Washington, D.C.

Before FRIEDMAN, Circuit Judge, COWEN, Senior Circuit Judge, and RICH, Circuit Judge.

COWEN, Senior Circuit Judge.

This appeal is from a judgment of the United States Claims Court (Claims Court)[1] which granted the government's motion for summary judgment, dismissed the complaint, and held that the appellants (plaintiffs) were not entitled to recover for a Fifth Amendment taking of their unpatented mining claims. We vacate the judgment of the Claims Court and remand the case to it.

## I. *Factual Background and Prior Proceedings*

Plaintiffs, holders of unpatented mining claims situated in Shoshone County, Idaho, in the vicinity of the upper St. Joe River,

---

1. 2 Cl.Ct. 795 (1983).

from Spruce Tree Campground to Heller Creek, properly recorded them with the Bureau of Land Management, as required by the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1744. The principal minerals claimed were garnet and gold. Plaintiffs never applied for a patent on any of the claims in issue.

In 1968, Congress established the national wild and scenic rivers system to preserve selected rivers with outstandingly remarkable values in a free-flowing condition, with the rivers and their immediate environments protected for the benefit and enjoyment of present and future generations. The Wild and Scenic Rivers Act of 1968, Pub.L. 90–542, 82 Stat. 906, designated eight rivers as components of the system, and listed 27 rivers as potential additions to the system, including in section 5(a)(22): "Saint Joe, Idaho: The entire main stem."

Section 9 of the 1968 Act, 16 U.S.C. § 1280, provides:

(a) Nothing in this chapter shall affect the applicability of the United States mining and mineral leasing laws within components of the national wild and scenic rivers system except that—

* * * * * *

(iii) subject to valid existing rights, the minerals in Federal lands which are part of the system and constitute the bed or bank or are situated within one-quarter mile of the bank of any river designated a wild river under this chapter *or any subsequent Act* are hereby withdrawn from all forms of appropriation under the mining laws and from operation of the mineral leasing laws including, in both cases, amendments thereto. [Emphasis added.]

* * * * * *

(b) The minerals in any Federal lands which constitute the bed or bank or are situated within one-quarter mile of the bank of any river which is listed in section 1276(a) of this title are hereby withdrawn from all forms of appropriation under the mining laws during the periods specified in section 1278(b) of this title. Nothing contained in this subsection shall be construed to forbid prospecting or the issuance of leases, licenses, and permits under the mineral leasing laws subject to such conditions as the Secretary of the Interior and, in the case of national forest lands, the Secretary of Agriculture find appropriate to safeguard the area in the event it is subsequently included in the system.

On November 10, 1978, the Wild and Scenic Rivers Act was amended by section 708 of the National Parks and Recreation Act of 1978, Pub.L. 95–625 (codified as 16 U.S.C. § 1274(a)(23)). The amendment added the St. Joe River as a part of the national system, providing in pertinent part as follows:

*Dredge or placer mining shall be prohibited within the banks or beds of the main stem of the Saint Joe and its tributary streams in their entirety above the confluence of the main stem with the North Fork of the river.* * * * *For the purposes of this river, there are authorized to be appropriated not more than $1,000,000 for the acquisition of lands or interest in lands.* [Emphasis Added.]

*Id.*

Since the mining claims are located within the St. Joe National Forest, plaintiffs are required to comply with Forest Service regulations promulgated for the protection and preservation of national forests. 36 C.F.R. § 228 (1983) (formerly 36 C.F.R. § 252). The stated purpose of these regulations is to ensure that mining operations are "conducted so as to minimize adverse environmental impacts on National Forest Systems surface resources." 36 C.F.R. § 228.1. A mine operator contemplating operations which would cause significant disturbance of surface resources is required by the regulations to submit a proposed plan of operations and to post a bond to ensure compliance with reclamation requirements.

Plaintiffs' operating plan was filed with the Forest Service in 1976, but that agency withheld action on the plan for 2 years

while it considered the need for an environmental impact statement. In 1978, action on the plan was again deferred pending the outcome of a mineral contest proposed to be filed in behalf of the Forest Service by the Bureau of Land Management (BLM) of the Department of the Interior (Interior). So far as the record shows, no decision approving or rejecting the plan has ever been made by the Forest Service.

The present action was filed in the then Court of Claims on March 5, 1979, claiming just compensation in the amount of ten million dollars, and alleging that:

1. The mining claims at issue were validly owned and are leased in compliance with the mining laws of the United States.

2. The United States effected a legislative taking of the mining claims by the enactment of section 708 of the National Parks and Recreation Act of 1978.

3. Pursuant to that Act, the United States has prevented and prohibited the owners of the claims from exercising rights possessed under the Federal mining laws.

In order to ascertain the extent and validity of any property rights the plaintiffs possessed on November 10, 1978, the trial court, by order of August 22, 1979, stayed proceedings on the government's motion to permit the Secretary of the Interior to determine the validity of the mining claims, including the issue of discovery, in administrative contest proceedings.

On January 15, 1981, on behalf of the Forest Service, BLM filed an administrative complaint contesting the plaintiffs' placer mining claims. The claims were alleged to be invalid on the grounds of improper location, location or relocation on lands withdrawn from appropriation, abandonment, and lack of discovery of valuable mineral deposits sufficient to support a mining location.

On November 13, 1981, while the mineral contest was pending, the Idaho State Office of BLM declared the mining claims abandoned and void because of plaintiffs' failure to file evidence of assessment work or notice of intention to hold the claims, as required by 43 U.S.C. § 1744. In view of this determination by BLM, the mining contest was dismissed without prejudice to either party by the Office of Hearings and Appeals, Department of the Interior, Salt Lake City, Utah. The decision left undecided the allegation that plaintiffs' claims were invalid for lack of discovery of valuable minerals. Plaintiffs did not appeal the dismissal, but did appeal the declaration of abandonment to the Interior Board of Land Appeals (IBLA). There plaintiffs argued that since the government had taken their claims on November 10, 1978, by section 708, the claims were no longer owned by them, and therefore, that the claims could not have been abandoned on November 13, 1981, when the BLM so decided. However, the IBLA upheld the BLM decision on April 19, 1982, stating that:

> The United States Court of Claims is being advised that the Department of the Interior now considers the claims to be abandoned and void.

■ After the stay of proceedings was lifted, the Claims Court granted summary judgment for the government on July 6, 1983. Initially, the court held that the government was entitled to judgment as a matter of law on the ground that the mining claims were invalid for lack of discovery of valuable mineral deposits. Alternatively, the court held that even if the claims were assumed to be valid as of November 10, 1978, the enactment of section 708 did not constitute a compensable taking, and that plaintiffs could not show any governmental action which constituted an inverse condemnation of their claims.

## II.  *The Validity of the Unpatented Mining Claims*

After discovery of a valuable mineral deposit upon a properly located claim, the possessory right of the locater is

> [A] property right in the full sense, unaffected by the fact that paramount title to the land is in the United States [citation omitted] and it is capable of transfer by conveyance, inheritance, or devise.

*Union Oil Co. v. Smith*, 249 U.S. 337, 349, 39 S.Ct. 308, 311, 63 L.Ed. 635 (1919). *A fortiori* it is a property right which is within the protection of the Fifth Amendment's prohibition against the taking of private property for public use without just compensation. *Freese v. United States*, 639 F.2d 754, 226 Ct.Cl. 252 (1981).

The test approved by the Supreme Court for a valuable mineral deposit is the "prudent man" test—the discovered deposits must be of such character that a person of ordinary prudence would be justified in the further expenditure of labor and means with a reasonable prospect of success in developing a valuable mine. Actual successful or profitable mining is not required. *United States v. Coleman*, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968).

Although these well established principles were discussed in the trial judge's opinion, we think he erred in applying them to the facts before him and in granting the government's motion for summary judgment on the ground that the mining claims were invalid for lack of discovery of a valuable mineral deposit. We vacate his decision because:

■ A. The record in this case discloses the singular fact that the government did not move for summary judgment on the ground that plaintiffs had failed to discover a valuable mineral deposit on their claims. The trial judge made his decision *sua sponte* and in spite of a joint pretrial statement submitted by counsel for the parties in which they agreed that one of the major factual issues which had to be resolved by the court was whether any of the claims was supported by the discovery of valuable minerals. Furthermore, in its brief to this court, the government has not contested plaintiffs' contentions that the trial judge erred in granting the motion for summary judgment on the discovery issue and has not requested us to affirm the decision of the Claims Court on that ground.

B. The pleadings, admissions on file, affidavits, and other available materials did not, as required by Rule 56(c) of the Claims Court, establish that there was no genuine issue on the discovery question and that the government was entitled to a judgment on that issue as a matter of law. Plaintiffs have informed us, and the government does not disagree, that the only materials available to support the trial court's grant of summary judgment were the following:

1. A written notice of April 6, 1967, in which the plaintiffs terminated a written mining lease theretofore granted to Continental Rare Metals Corporation on the ground that the lessee was unable to produce a marketable grade of river run garnet from the property at any time during the operating season of 1966. However, there was also on file an affidavit by one of the original plaintiffs, now deceased, stating that after the cancellation of the lease, plaintiffs decided to lease the claims to another, who would cooperate with the Forest Service; that in 1973, one of the plaintiffs and a mining engineer found both gold and garnet on the entire area of two of the claims, and that in 1975, the lessee, after making several tests, decided to initiate active mining on the claims, but had been prevented from doing so by various actions of the Forest Service.

2. Plaintiffs' plan of operation, submitted to the Forest Service April 26, 1976, in compliance with its regulations, stated that the 1975 test program indicated that both gold and garnet of value could economically be recovered from the claims.

3. The decision of the IBLA dated April 19, 1982, affirming the decision of the Idaho State Office of the BLM, that the unpatented mining claims had been abandoned and were void. In its decision, the IBLA did not decide whether there had been a valid discovery of minerals on the claims.

4. The November 19, 1981, order of the Office of Hearings and Appeals of Interior which dismissed without prejudice to either party the mineral contest previously filed on behalf of the Forest Service. The administrative law judge made this ruling in view of the BLM

decision that the claims were null and void, and stated that the claimants should have the opportunity to pursue their action in the Court of Claims, since there was no basis for him to determine the validity of the claims at the time of the alleged taking.

5. An affidavit by a Forest Service Director of the Minerals and Geology Staff in Region I, stating that the Forest Service had not determined whether a deposit of valuable minerals was present within the claims.

■ From our examination of these materials, it is quite clear that they were wholly inadequate to establish, by undisputed facts, that there was no deposit of gold or garnet on the claims, and that if there was such a deposit, it could not be mined and sold at a profit. In these circumstances, summary judgment should not have been granted on behalf of the government even had plaintiffs failed to present any opposing evidentiary material. *Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Claims Court erroneously placed the burden on plaintiffs to come forward with evidence to show that they had discovered a valuable mineral deposit. Its opinion stated:

> Defendant's motion for summary judgment puts the fact of discovery in issue. Plaintiffs' response does not include affidavits or other explanation as to time and nature of a discovery of valuable minerals on each of the unpatented claims it has located which would satisfy the discovery standards listed above.

*Skaw v. United States*, 2 Cl.Ct. 795, 801 (1983).

C. We think the trial judge also erred in refusing to consider two documents which plaintiffs relied on to show discovery:

1. A letter dated October 9, 1962, by a Forest Service supervisor stating that plaintiffs' lessee had made a valid discovery of minerals on the claim.

2. The Wild and Scenic Rivers Study Report and Environmental Statement on the St. Joe River, prepared by the Secretary of Agriculture and presented to Congress in 1968. Among other things, the report stated that it was estimated by the Forest Service that there may be more than 70,000 tons of garnet between Color and Heller Creeks on the St. Joe River, and that the garnet deposits on the St. Joe River might produce about three million dollars in gross revenue if mined.

■ The trial judge refused to consider these documents on the ground that since the Secretary of the Interior is responsible for determining the validity of mining claims, statements by Forest Service employees do not constitute admissions by the government, and that the statements were too general to establish that valuable minerals had been discovered on the claims. Although we intimate no opinion on the weight to be accorded these statements during the trial of the case, we think they should have been considered in connection with the materials the trial judge relied on in granting summary judgment. Section 708 itself provides that the Secretary of Agriculture, through the Forest Service, shall be in charge of administering the Wild and Scenic Rivers Act program on the St. Joe River. The trial judge recognized this and in his opinion stated:

> The prohibition against dredge and placer mining gives the Forest Service a management directive and an administrative tool.

2 Cl.Ct. at 802.

Consequently, we think the statements were admissible for summary judgment purposes. *Mahlandt v. Wild Canid Survival & Research Center, Inc.*, 588 F.2d 626, 630 (8th Cir.1978). The report submitted by the Secretary of Agriculture to the Congress should have been considered also, under the rule that public reports issued by agencies of the government, including evaluation reports, are admissible in evidence. *United States v. American Telephone and Telegraph Co.*, 498 F.Supp. 353, 359 (D.D.C.1980).

■ In a footnote to its brief, the government states that in the event this

court reverses the decision of the trial judge on this issue, it would be appropriate to instruct the Claims Court to again refer the questions of validity and location of the claims to Interior, in compliance with the doctrine of primary jurisdiction. The government candidly admits that since Interior has already ruled that the claims are null and void, it is doubtful whether that department now has jurisdiction to decide the discovery issue. We agree, and for several other reasons, reject the suggestion. We do not think that the doctrine of primary jurisdiction requires a court to refer a question to an agency where, as here, the agency has declined to decide the precise question on a prior reference by the court. *See Atchison, Topeka and Santa Fe Ry. Co. v. Airport Transport Ass'n, et al.*, 253 F.2d 877, 886 (D.C.Cir.1958). As the Supreme Court has observed, "the doctrine of primary jurisdiction is not a doctrine of futility." *Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.*, 381 U.S. 676, 686, 85 S.Ct. 1596, 1600, 14 L.Ed.2d 640 (1965).

It is highly probable that a second referral to Interior would result only in further delaying the trial in the Claims Court, and increasing the expense to both parties. Furthermore, the parties agree that the Claims Court is competent to decide the question, just as district courts frequently do in condemnation cases. *See, e.g., United States v. 237,500 Acres of Land*, 236 F.Supp. 44 (S.D.Cal.1964).

Fairness to the plaintiffs is also a consideration which militates strongly against the adoption of the government's suggestion. Proceedings in the court were suspended for nearly 3 years as a result of the 1979 reference, and plaintiffs' right to a trial has been delayed for more than 5 years. They should not be made to suffer another prolonged delay, when there is no real justification for a second resort to an administrative proceeding. Therefore, the Claims Court should proceed expeditiously to resolve these and other issues remanded in this decision.

## III. *The Legislative Taking Issue*

■ We cannot agree with the following holding of the Claims Court that section 708 was not a legislative taking which deprived plaintiffs of the right to just compensation because:

> Congress made no provision for the vesting of specifically defined property in the United States as of a particular date, nor was provision made for judicial determination and payment of just compensation. Section 708 does not affirmatively direct the Secretary of the Interior to exercise the power of eminent domain.

2 Cl.Ct. at 802.

In the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 126–27, 95 S.Ct. 335, 350, 42 L.Ed.2d 320 (1974), the Supreme Court made it clear that none of these elements is an essential ingredient of a legislative taking. There the Court stated:

> The general rule is that whether or not the United States so intended, "[i]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine." *United States v. Causby*, 328 U.S. 256, 267 [66 S.Ct. 1062, 1068, 90 L.Ed. 1206] (1946). "[I]f the authorized action ... does constitute a taking of property for which there must be just compensation under the Fifth Amendment, the Government has impliedly promised to pay that compensation and has afforded a remedy for its recovery by a suit in the Court of Claims. *Yearsley v. Ross Constr. Co.*, 309 U.S. 18, 21 [60 S.Ct. 413, 414, 84 L.Ed. 554] (1940). *See also Hurley v. Kincaid*, 285 U.S. 95 [52 S.Ct. 267, 76 L.Ed. 637] (1932).

Moreover, there was no occasion for the Congress to provide for the vesting of the property in the United States, because it already held both legal and equitable title, subject only to plaintiffs' possessory rights.

In addition, the last sentence of section 708 indicates that Congress intended to pay compensation for any property interest taken because it provides:

For the purposes of this river, there are authorized to be appropriated not more than $1,000,000 for the acquisition of lands or interest in lands.

16 U.S.C. § 1274(a)(23).

In the *Regional Rail Reorganization Act Cases,* the Supreme Court scrutinized the regulatory act before it to see if Congress had withdrawn the Tucker Act grant of jurisdiction to the Court of Claims. In the same way, we find that there is nothing in the language of section 708 indicating that Congress intended to withdraw the Tucker Act remedy for the recovery of just compensation. Also, we have not found nor have we been cited to anything in the legislative history which indicates such a Congressional intent.

Because it collides with a recent declaration by this court, we must also disagree with the conclusion of the Claims Court that there was no inverse condemnation of the plaintiffs' claims because there has been no physical invasion of plaintiffs' property. In *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir. 1983), a case involving somewhat similar facts, this court, speaking through Chief Judge Markey, stated:

> Neither physical invasion nor physical restraint constitutes a *sine qua non* of a constitutionally controlled taking.

We agree with the holding of the Claims Court that without doubt, the United States has the authority to regulate the use of the land on which the claims are located and that section 708 is a lawful exercise of the regulatory power of the government to protect and promote the general welfare. There remains, however, the difficult question whether such regulatory action has resulted in depriving plaintiffs of any economically viable use of the claims. *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). Because of material factual disputes which the parties so designated and jointly submitted to the trial court, we hold that this crucial issue could not properly be resolved on summary judgment and that it cannot be decided by this court on the present record.

The analysis of whether a particular regulatory act constitutes a legislative taking remains one of the most troublesome line-drawing exercises in the judicial function, characterized by a few basic precepts and the admonition that each case turns on its own peculiar facts. In the field of land use regulation, the emphasis which Justice Holmes placed on the degree of value diminution suffered by the property owner has continued to be the central focus of modern case law on the subject. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). However devised or articulated, the heart of the inquiry is whether the governmental action is so onerous as to constitute a Fifth Amendment taking. As the Claims Court correctly stated, permissible governmental regulatory action does not constitute a compensable taking merely because the result may diminish the value of the property or prevent its most beneficial use. *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

The Supreme Court recently stated that to determine whether a regulation amounts to a Fifth Amendment taking requires—

> essentially ad hoc, factual inquiries that have identified several factors—such as economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action * * *.

*Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979).

As we have stated above, this inquiry necessitates a remand of the case to the trial court for resolution of the following factual issues, which were listed in the joint submission of counsel for the parties to the Claims Court: [2]

---

**2.** This listing is not intended to exclude the trial of such other factual disputes as the Claims Court deems necessary for the disposition of the case.

a. Which of the claims, in whole or in part, fall within the definition of beds and banks as referred to in Public Law 95–625, Sec. 708?

b. Can the Plaintiffs' alleged unpatented mining claims be mined by methods other than placer or dredge mining methods?

c. If there was only a portion of the claims taken, can the remainder be mined or is there in effect a taking of the whole by taking of part?

## IV. *The Idaho Statutes*

The Idaho Dredge and Placer Mining Protection Act, Idaho Code Title 47, ch. 13, which was enacted in 1955, requires operators of dredge or placer mining on lands and beds of streams in the state of Idaho to obtain a permit from the state agency. This requirement, as applied to operations on the federal public domain, was upheld by the Idaho Supreme Court. *State ex rel. Andrus v. Click,* 97 Idaho 791, 554 P.2d 969 (1976).

■ The conclusion of the Claims Court that there was no inverse condemnation of plaintiffs' mining claims was based in part upon its finding that the plaintiffs had no permit from the state of Idaho that was interfered with or barred by the enactment of section 708. However, we think the court's reliance on the lack of a state permit ignores the distinction between the property rights held by plaintiffs in their unpatented claims as stated in *Union Oil Co. of California v. Smith, supra,* and a permit to exercise those rights. If after a trial it is determined that section 708 deprived plaintiffs of any economically viable use of their property, as they claim, the lack of a state permit would not bar their right to recover. We agree with plaintiffs that to say that they are not entitled to compensation—

because of the lack of permits is the same as saying an owner of land permanently flooded by a federal dam cannot receive compensation because he had not

received a building permit, which could not be refused prior to the flooding. The owner of the flooded land had the right to build at any time he chose and receive the permit any time he chose to start building. [Appellants' Reply Brief, pp. 11–12].

The state of Idaho could not lawfully deny plaintiffs the right to mine. By complying with the state statute, plaintiffs could have obtained a permit to mine their claims until 1977, when the Idaho permit statute was amended by an act of the Idaho Legislature (Idaho Code section 47–1323), prohibiting dredge mining in any form on the St. Joe River or its tributaries. We assume that if plaintiffs had applied for a permit to conduct dredge mining (which plaintiffs say is the only feasible method of mining their claims) in 1977 or thereafter, the state would have denied the permit. Since the Claims Court rested its decision in part on the 1977 Act, we hold that plaintiffs' right to recover is not affected by that act, because, in so far as plaintiffs' claims are concerned, it was in conflict with and was preempted by previously enacted federal mining law. Act of May 1, 1872, codified as 30 U.S.C. §§ 21, *et seq. Kleppe v. New Mexico,* 426 U.S. 529, 543, 96 S.Ct. 2285, 2293, 49 L.Ed.2d 34 (1976); *Ventura County v. Gulf Oil Corporation,* 601 F.2d 1080 (9th Cir.1979) *aff'd* 445 U.S. 947, 100 S.Ct. 1593, 63 L.Ed.2d 782 (1980). Under the Act of May 1, 1872, plaintiffs had the property right to possess and mine to exhaustion the minerals located on their unpatented claims without payment of royalty. *Belk v. Meagher,* 104 U.S. 279, 26 L.Ed. 735 (1881); *Union Oil Co. of California v. Smith, supra.* Since it prohibited dredge mining on federal land, compliance with the 1977 Act would have made it impossible for plaintiffs to exercise rights theretofore granted by the mining laws. The Idaho Supreme Court has recognized that federal legislation necessarily overrides such a conflicting state law. *State ex rel. Andrus v. Click,* 97 Idaho 791, 554 P.2d 969, 974 (1976) (dictum).[3]

---

**3.** At oral argument government counsel virtually abandoned any defense based upon the 1977

### V. *The Forest Service Regulations*

 The government asserts that plaintiffs are not entitled to recover because they had not satisfied a pre-condition of their right to mine their claims by obtaining Forest Service approval of their plan of operation as required by the regulations, 36 C.F.R. § 252. We are astonished at this contention because the record shows that plaintiffs' failure to obtain an approved plan of operation was due to the delaying actions of the Forest Service.

In accordance with the regulations, plaintiffs submitted a plan of operations to the Forest Service on April 26, 1976 (App. pp. 193–204). The Forest Service withheld action on the plan for 2 years while it considered whether an environmental impact statement was required. In May 1977, plaintiffs were informed that an environmental impact statement would be needed, but that the time required for filing and preparing such a statement, would rule out any work in 1977. (App. pp. 221–222). The record does not reflect any other action by the Forest Service on plaintiffs' plan until June 9, 1978, when the agency advised plaintiffs that it would recommend that a mineral contest proceeding be initiated by the Department of the Interior and that consideration of the operating plan would be deferred pending the outcome of that contest. (App. p. 223). A few days later, on June 28, 1978, plaintiffs were informed that in view of the pendency of the wild and scenic river proposal and the proposed mineral contest, the plan would not be approved at that time. (App. p. 224). On November 10, 1978, section 708 became effective and removed the authority of the Forest Service to approve an operating plan which would involve dredge or placer mining within the banks or beds of the river. The mineral contest was not filed until January 15, 1981, and as previously stated, it was dismissed on November 19, 1981, without prejudice to either party.

The government admits that the Forest Service has never made a decision, either approving or disapproving plaintiffs' plan of operation.

As the Ninth Circuit aptly declared in a case involving the same regulations, there is nothing in the regulations which authorizes the Forest Service to prohibit plaintiffs' right to the possession and enjoyment of their claims, or to encroach impermissibly upon those rights by circumscribing their use in a manner that amounts to a prohibition. *United States v. Weiss*, 642 F.2d 296, 299 (1981).

For the reasons stated, the government's defense based on plaintiffs' lack of an approved plan of operations is flatly rejected.

VACATED AND REMANDED.

---

Act. He stated that the government would express no views on whether that statute was preempted by federal law, and was relying primarily on other grounds in urging affirmance of the Claims Court decision on the taking issue.